LAMM LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102774.   Promulgated September 3, 1941.

*Charles E. McCulloch, Esq., Thomas B. Stoel, Jr., Esq.,* and *H. Edwin Nowell, C. P. A.,* for the petitioner.
*B. M. Coon, Esq.,* for the respondent.

ARNOLD: This proceeding involves an income tax deficiency of $16,558.93 for the year 1936, of which $6,953.37 is normal tax and $9,605.56 is surtax on undistributed profits. Petitioner reported a net loss for the calendar year, but respondent, by virtue of various adjustments, determined a net income of $54,089.16. Petitioner challenges respondent's determination in the following particulars: (1) The inclusion in 1936 gross income of $20,000 representing income received as damages for breach of contract; (2) the disallowance of $14,000.04 as salary to petitioner's president; (3) the disallowance of

1

$28,130.50 representing depletion or amortization of a $200,000 deposit allegedly paid in connection with the acquisition of the right to cut certain timber; and (4) the proposed assessment of a surtax on undistributed profits. The facts and opinion with respect to each issue will be treated separately.

### FINDINGS OF FACT.

Petitioner is an Oregon corporation, with its principal place of business at Modoc Point, Klamath County, Oregon. At all times material hereto it was engaged in the logging and lumber manufacturing business. Its facilities were sufficient for a complete operation and consisted of a logging railroad, complete logging equipment, a sawmill plant, including kilns, a planing mill, and the townsite at Modoc Point. Wilfred E. Lamm has been president and manager of petitioner since its organization. Petitioner filed its income tax return for 1936 with the collector of internal revenue for the district of Oregon. Its books were kept and its return filed on the accrual basis.

### Issue 1.

### FACTS.

In December 1929 the Kesterson Lumber Co., sometimes referred to herein as the Lumber Co., contracted with petitioner for the shipment of logs over petitioner's railroad. Prior to November 1934 the Lumber Co. defaulted on its contract and on November 5, 1934, petitioner filed suit in the Circuit Court of the State of Oregon for the County of Klamath for $375,000 damages.

Pursuant to notice the creditors of the Lumber Co. held a meeting on October 24, 1935, for the purpose of considering petitioner's claim for damages. At this meeting the creditors agreed to a proposal which had resulted from negotiations between the parties litigant that the suit be settled by the Lumber Co. transferring certain items of equipment to the petitioner. Following the creditors' meeting and under date of October 25, 1935, petitioner's counsel received the following letter from counsel for the Lumber Co.:

The Kesterson creditors have authorized me to settle the Lamm claim on Lamm's terms, with a slight modification. They are willing that he should have the jammer, and I believe he wanted some cats and atheys. They are willing to give him three cats and atheys in addition to the jammer. They feel that turning over more cats and atheys would cripple the Kesterson operation unduly.

It will be necessary to get confirmation from the home offices of several of the creditors. I will prepare a written form of consent to be circulated among the creditors as soon as you advise me whether this proposal is acceptable.

*    *    *    *    *    *    *

Please tell Mr. Lamm that the Southern Pacific attorney who attended the meeting said that Southern Pacific would like the Kesterson ties on the Long-Bell

Unit to go with the steel. He didn't think this would make any practical difference to Lamm, because of course Southern Pacific would grant Lamm the use of the ties.

Pursuant to their understanding the parties litigant filed the following stipulation, dated October 29, 1935, with the Circuit Court:

WHEREAS, the plaintiff and defendant have reached an agreement of settlement in the above entitled cause; and,

WHEREAS, there are certain acts yet to be performed on the part of the defendant in performing said agreement;

THEREFORE, IT IS HEREBY STIPULATED by and between L. Orth Sisemore, of attorneys for defendant, and Wm. Kuykendall, of attorneys for plaintiff, that the above entitled cause be continued until the performance of said agreement above mentioned, the above entitled cause to be dismissed upon the performance of said agreement.

On October 29, 1935, the court continued the case in order "to give the defendant an opportunity to perform the, terms and conditions of the above mentioned agreement."

The value of the equipment that petitioner received under the agreement of settlement was $20,000. The equipment consisted of one McGiffert log loader, or jammer, three caterpillar tractors, arches, and winches, and certain railroad accessories.

Petitioner was advised by letter, dated November 20, 1935, that the Lumber Co. would be glad to help petitioner acquire title to the railroad accessories, but that the Southern Pacific Co. was insisting upon conveyance of the accessories to it as a condition to the cancellation of the Lumber Co.'s contract to purchase steel rail from the Southern Pacific Co.

By letter dated December 21, 1935, petitioner offered to cooperate with the Southern Pacific in securing its steel and in logging certain timber before tearing up the tracks if Southern Pacific would release the Lumber Co. from its rail contract so as to permit the transfer of the railroad accessories to petitioner. Such an arrangement was worked out with the Southern Pacific.

At the time the settlement was agreed to the log loader or jammer was in charge of and standing on the tracks of the Great Northern Railway Co. Both parties immediately notified the Great Northern Railway Co. that the jammer had become the property of the petitioner. Physical possession of the other equipment was taken by petitioner in March or April 1936.

Title to the equipment was not transferred until on or about May 19, 1937. Throughout the period between October 1935 and the transfer of title the Lumber Co. was engaged in securing formal consents to the transfer from its creditors. Its efforts were complicated by the fact that late in 1932 or early in 1933 it had transferred its assets, including the above equipment, to a new corporation, the Kesterson Lumber Corporation. The latter had not assumed

the liabilities of the Lumber Co., and before releasing title it attempted to force the best possible terms out of petitioner consistent with the stipulation filed in court. In a letter dated March 24, 1936, it suggested that, in case all creditors did not approve the deal, petitioner should pay the corporation a rental of $350 per month on the jammer and $200 per month for each tractor and the arches that went with them, the equipment to be returned at petitioner's expense on demand.

In reply thereto petitioner, by letter dated March 26, 1936, informed the Kesterson Lumber Corporation that it was "not concerned with the method of accounting between your new corporation and the old company", and that it would not pay "rental on the equipment nor have any strings tied to it other than acknowledging that title is to remain with you a reasonable time in order to allow you to obtain written approval of creditors." The letter further stated:

There have been so many delays to the transfer heretofore, all of which now seem to be cleared up except confirmation in writing by your creditors of their verbal approval which we have been told was one hundred percent, that we feel there is no logical reason for withholding delivery, in view of our willingness to await transfer of title.

Will you, therefore, please arrange for release of equipment immediately.

The Kesterson Lumber Corporation replied to petitioner on March 28, 1936, as follows:

Your communication of March 26th, in reply to ours of March 24th is received.

Your anxiety to settle "completely and quickly" the law suit which you brought against the Kesterson Lumber Company is a condition that may be desirable, but certainly you have retarded any early settlement by your failure to meet with the creditors of the Kesterson Lumber Company when the meeting was called last October, for the purpose of permitting you to present your claim and try and effect a settlement. Subsequent to the creditors meeting you demanded other equipment which was also demanded by the Southern Pacific Co., and your negotiations with the Southern Pacific Co., to secure the additional property was not completed, as far as the Kesterson Lumber Company knew, until receipt of a letter from the Southern Pacific Co. dated March 5th, 1936.

On March 11th, 1936, the attorneys handling the settlement between the creditors of the Kesterson Lumber Company,—Williamson and Wallace of San Francisco—had prepared and mailed to the creditors a statement and creditors agreement for their execution.

You have been crowding our attorney, Mr. McColloch since last October for the title to the equipment, which is contemplated being turned over to you as soon as we have written authority from the creditors to make the settlement with you.

Mr. McColloch advised us that he saw no objection to permitting you to use the equipment and we consented with him that if the equipment would be of assistance in starting your operations this spring, that we would permit the Corporation to let you use the equipment pending the settlement between your

claim and the Kesterson Lumber Company creditors. That was the spirit in which Mr. McColloch wrote you on March 20th.

We wrote you on March 24th to clarify the understanding and suggested a certain rental for equipment in case the Kesterson Lumber Company creditors did not approve the settlement as finally submitted. Your reply leads us to believe that you are not willing to accept the free use of the equipment until the Kesterson Lumber Company settlement between creditors was finally determined. If you consider our permitting the free use of the equipment as a delivery of the equipment from the Kesterson Lumber Company, the Kesterson Lumber Corporation cannot turn the equipment over to you.

We are still willing to be helpful, but the Corporation has nothing to do with the affairs of the Company, and will not engage in any controversy between the creditors and claimants of the Company. In case you want the use of the equipment the Corporation is perfectly willing to give you the use of it without charge, and if you do not wish to agree to any rental charge pending settlement between the Kesterson Lumber Company creditors and will agree to return the equipment to the Corporation at Klamath Falls at any time at their request, such an arrangement will be satisfactory.

You may have been informed that the Kesterson Lumber Company creditors agreed one hundred percent to the recognition of your claim and a division of the property, according to the plan that was submitted to them as of March 11th, 1936, but there has been no such statement made to you by any member of the Kesterson Lumber Company. You know that all the creditors were not present at the creditors meeting in October and you also know that some of the principals of the creditors represented were not present.

We trust we have made ourselves clear as to the logical reasons for wanting an understanding about the title to the equipment before it is turned over for your use and of our willingness to cooperate.

On April 6, 1936, petitioner and the Kesterson Lumber Corporation executed an agreement in which petitioner "acknowledges receipt this day of the following equipment from the Kesterson Lumber Corporation:

1 McGiffert Log Loader with all parts and accessories.
3-60 H. P. Caterpillar Tractor complete (ones as agreed).
3 Logging Archer with tracks (Lamm Choice)
3 Williamette winches (Lamm's choice)
All railroad and other equipment on Long Bell Timber tract except steel rail belonging to either S. P. Company or Great Northern Company.

Lamm Lumber Company agrees that this is the property of Kesterson Lumber Corporation. Use is granted to Lamm Lumber Company, by the Kesterson Lumber Corporation for an indefinite period.

It is understood that the Kesterson Lumber Corporation will use its best efforts to get the title to this property into the name of the Kesterson Lumber Company, and when that is accomplished to further use their efforts to transfer absolute title to Lamm Lumber Company in pursuance of a stipulation entered into between Lamm Lumber Company and Kesterson Lumber Company, in a certain suit in the Klamath County Circuit Court, under date of October 29, 1935.

By bill of sale dated May 19, 1937, the Lumber Co. transferred title to the log loader, tractors, and arches. The instrument specifically refers to the equipment as "heretofore, about the 1st of January, 1936.

delivered by the grantor herein to the grantee herein, and since then and now being in the possession of the grantee."

On May 20, 1937, the damage suit against the Lumber Co. was dismissed with prejudice.

By appropriate entries on its books as of December 31, 1935, petitioner accrued the value of the equipment as income of that year, and included the $20,000 as income in its tax return for 1935.

### OPINION.

The question here is whether petitioner properly accrued the value of the equipment as income for 1935. No question is presented regarding the amount or that the amount was realized either in 1935 or 1936. Being on the accrual basis of accounting, petitioner considered that the settlement agreement fixed its right to receive the income in 1935 and that the difficulties of the Lumber Co. in fulfilling its responsibilities in no way jeopardized its right to receive the equipment.

Respondent contends that the facts and circumstances herein show that it was during 1936 that the equipment to be delivered was definitely fixed and delivery made. Not until then was petitioner fully justified, according to respondent, in accruing the income on its books and in noting the actual physical receipt of the income. He cites, among others, our decisions in *Sowers Manufacturing Co.*, 16 B. T. A. 268; *Commercial Electrical Supply Co.*, 8 B. T. A. 986; *Emanuel Solomon Ullmann*, 30 B. T. A. 764; affd., 77 Fed. (2d) 827; certiorari denied, 296 U. S. 631; *Higgins Estate, Inc.*, 30 B. T. A. 814; reversed, 88 Fed. (2d) 1011; and *Herman J. Sternberg*, 32 B. T. A. 1039.

The rule regarding the accrual of income is stated in *Estate of G. A. E. Kohler*, 37 B. T. A. 1019, 1029, as follows:

\* \* \* Income accrues when the amount of it and the right to it are fixed, provided the right is not contingent, and provided that there is a reasonable expectation that payment will be made in due course.

When accounts are kept and returns filed on the accrual basis "it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues." *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182.

Here, the right to receive property of an estimated value of $20,000 became fixed in 1935. The fact that the property was not received until a subsequent year did not affect the right to receive, but constituted satisfaction or discharge of the obligation to deliver.

After carefully weighing the evidence adduced and the fact that the agreement in settlement was with the Lumber Co. and not the Lum-

ber Corporation, it is our opinion that petitioner has brought itself within the rule and properly accrued the income for the year 1935. We can find no denial in the correspondence, the agreement of April 6, 1936, or the bill of sale of petitioner's right to receive the equipment as fixed by the agreement of settlement in October 1935. Thereafter, the details of performance caused embarrassment to both parties litigant, but these details were no more burdensome than those confronting the taxpayer in *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290, where the Supreme Court held the amount of an award should be estimated and accrued, despite details which might influence the amount thereof. Here, petitioner knew the amount and was justified in its expectation at the close of 1935 that the Lumber Co. would comply with the agreement.

We can not attach the same evidentiary value to delivery that respondent does. Delivery under the agreement of settlement constituted payment, and it is well settled that a taxpayer on the accrual basis must report items of income as they accrue without regard to the time of payment. *Sowers Manufacturing Co.*, *supra; Spring City Foundry Co.* v. *Commissioner*, *supra.* As we understand the evidence, petitioner's right to receive the equipment was never questioned. The delay in securing formal written consents from creditors and the dispute over the manner of selecting the tractors, arches, and winches merely emphasize the difficulties faced by the Lumber Co. in performing. These difficulties were largely self-imposed by the transfer of assets without provision for creditors, and the record shows that petitioner assisted in satisfying one creditor by arranging separately with the Southern Pacific Co. for the railroad accessories which otherwise might have been claimed by the Southern Pacific.

Our examination of the cases cited by respondent convinces us that they are not controlling and are distinguishable. On this issue we sustain the petitioner. *Continental Tie & Lumber Co.* v. *Commissioner*, *supra; Automobile Insurance Co. of Hartford* v. *Commissioner*, 72 Fed. (2d) 265.

*Issue 2.*

FACTS.

In 1926 petitioner's directors fixed the annual salary of W. E. Lamm* at $24,000. During 1930, 1931, and 1932 Lamm accepted certain wage cuts, along with petitioner's employees, but withdrew his entire salary as reduced. Beginning with the year 1933 and through the taxable year, Lamm withdrew less than the amounts credited to him as salary, for reasons hereinafter set forth. The salary credited to him and the salary paid for the years 1933 to 1936, inclusive, were as follows:

| Year | Salary credited | Salary paid | Year | Salary credited | Salary paid |
|------|----------------|-------------|------|----------------|-------------|
| 1933 | $16,199.99 | $10,833.30 | 1935 | $21,319.60 | $9,999.96 |
| 1934 | 19,200.00 | 10,000.00 | 1936 | 24,000.00 | 9,999.96 |

The difference between the salary credited or accrued on petitioner's books and the salary paid was credited to an account payable to Lamm. This indebtedness has not been paid by petitioner nor forgiven by Lamm, who fully expects to collect the total amount thereof.

In 1933 petitioner's obligations included approximately $320,000 to three banks, in addition to other obligations in a substantial amount. Under date of May 16, 1933, it entered into a subordination agreement with certain of its creditors whereby interest was reduced from 8 percent to 6 percent on obligations totaling $440,000, the maturities were extended, and the obligations due the other creditors were subordinated to the obligations due the banks. Contemporaneously therewith petitioner and the banks executed an agreement whereby petitioner transferred its chattel mortgages, warehouse receipts, and other property to the bank, which already held a mortgage on petitioner's real property, as collateral security for its obligations then existing or thereafter created, and granted broad powers to the banks with respect to the security deposited and the management and control thereof. Pursuant to the terms of the agreement and in the supervision of petitioner's operations, the banks limited the cash withdrawals by Lamm to $10,000 per year. Since 1933 the petitioner has reduced its obligations to the banks to $150,000, and the banks, subsequent to the taxable year, permitted Lamm to increase the amount of his cash withdrawals.

In April 1933 petitioner contracted with the Long-Bell Lumber Co. for the cutting of 300,000,000 feet of timber. The contract, hereinafter more fully set forth, provided that the Long-Bell people should be entitled to additional stumpage payments under certain circumstances not here material. In determining the extent to which the Long-Bell Co. would participate, petitioner included as a part of its cost of operation the annual salary of $24,000 accrued on its books for the services of its president and general manager. For each of the years 1933 to 1936, petitioner settled with the Long-Bell Lumber Co. upon the basis of a salary for Lamm of $24,000 per year, without objection on the part of the latter company.

For 1936 petitioner accrued on its books and deducted on its income tax return a salary of $24,000 for W. E. Lamm. The respondent disallowed $14,000.04 thereof for the reason that it did not constitute an ordinary and necessary expense paid or incurred during the taxable year.

The salary accrued on petitioner's books for 1936 constituted reasonable compensation for the personal services rendered by petitioner's president and general manager, and was an ordinary and necessary expense of the taxable year.

The question here is whether petitioner is entitled to deduct the entire salary accrued on its books, or only that portion thereof actually paid. We do not understand that the reasonableness of the salary accrued is questioned. Respondent contends that there is no justification for petitioner accruing more than could be paid, that no more than $10,000 could be paid in view of petitioner's critical financial condition and in view of control exercised over it by the banks, and that at the close of the year there was no reasonable ground for believing that the $14,000 would ever be paid.

The evidence shows that petitioner's financial condition in 1933 was bad, but that it was not considered hopeless by its bank or other creditors. Arrangements were made during 1933 with the banks and some of its other creditors to reduce the interest rate on $440,000 of petitioner's obligations from 8 percent to 6 percent, and petitioner's operations were continued under the supervision of the banks. Under the arrangement the banks have exercised almost complete control over petitioner since May 1933, and it was pursuant thereto that Lamm's salary withdrawals were limited to $10,000 per year. The results have justified the belief of creditors that petitioner's financial condition was not hopeless. Its obligations have been substantially reduced, and earnings of approximately $50,000 were anticipated for 1940. An officer of the bank testified that petitioner was in a comparatively easy condition today, provided the creditors continued to go along with them. And he testified that the banks intended to continue going along with petitioner, advancing credit as before under the agreement of May 16, 1933.

That the salary accrued represented a real and substantial liability of the petitioner, as to the unpaid portion thereof, is demonstrated by the recognition accorded the accrual by the Long-Bell Lumber Co. under its timber-cutting contract with petitioner. By this contract the Long-Bell people were entitled to participation in the profits from timber cut, under certain prescribed conditions. In determining the amount of the latter's participation Lamm's accrual salary was always included as a part of each year's operating costs without objection, which indicates that the Long-Bell Lumber Co. considered the payment a reasonable expense of the operation.

The liability of petitioner for the salary accrued is established by the directors' action in 1926. The accrued but unpaid salary was and is carried as an account payable to Lamm, who testified that the in-

debtedness had not been forgiven and that he expected to collect the same. Delay in payment can not defeat the accrual where all events had happened which fixed the liability. The personal services were rendered by Lamm in 1936 and the liability accrued in that year. We are of the opinion that the accrual herein was proper and that the deduction of $24,000 should be allowed. *Benton County Hardware Co.*, 10 B. T. A. 869. Furthermore, it is our opinion that the salary constituted an ordinary and necessary expense of petitioner's business operations.

## Issue 3.

### FACTS.

On its return for the taxable year petitioner deducted $28,130.50 representing "Depletion, of deposit on Timber Contract 42,195,760 ft. at 66⅔¢ per M." The deduction so claimed grew out of the transactions hereinafter set forth.

Under date of August 24, 1929, petitioner and the Long-Bell Lumber Co., a Missouri corporation, executed an agreement, effective as of August 23, 1928, whereby petitioner agreed to purchase approximately 600,000,000 feet of timber on approximately 24,294.37 acres of land in Klamath and Lake Counties, Oregon. The purchase price of land and timber was fixed by article II at $3,600,000, of which $3,400,000 was payable in 25 stated installments, the last installment being due December 31, 1939. Petitioner paid $200,000 of the purchase price with the execution of the contract, which provided that this payment "shall always remain intact and inapplicable to payment for cutting privileges until used to make the last payments on the contract price."

The contract further provided that in case of a default by petitioner which continued for 180 days, the Long-Bell Lumber Co. could terminate the contract and all rights of petitioner by notice in writing, and retain as part of the liquidated damages for the default all sums previously paid under the contract. No provision was made by the contract for any participation by the Long-Bell Lumber Co. in the profits from the operation.

During 1930 and 1931 petitioner cut 30,000,000 feet and 10,000,000 feet of timber, respectively, under the aforesaid contract. In the fall of 1931 it suspended operations and in 1932 it became apparent that operations could not be continued under the original contract. Negotiations respecting the contract were entered into with the Long-Bell Lumber Co.'s representative on the Pacific coast and later in the year petitioner's president and its secretary went to Kansas City, Missouri, where a new agreement was reached by the contracting parties. At no time after suspension of operations was petitioner notified in writ-

ing by the Long-Bell Lumber Co. that it elected to terminate the original contract.

By letter dated December 8, 1932, the president of the Long-Bell Lumber Co. advised petitioner's president as follows:

I herewith hand you the memorandum of our discussions with reference to the timber contract now existing between our companies and an intention to amend the same.

It is our mutual intent to extend this memorandum into a new contract upon completion of certain negotiations familiar to both of us.

The memorandum mentioned provided in part as follows:

(1) The existing contract to be amended, with the consent of the Central Republic Bank & Trust Company, Trustee, in the Long-Bell mortgage, by a contract containing, among others, the terms and provisions indicated in this memorandum, such amendment to supersede the existing contract.

(2) The amendment is to be dated December 31, 1932, and is to be effective from and after that date.

 *         *         *         *         *         *         *

(18) As part of the consideration of the new contract, Long-Bell shall retain as its own the $200,000.00 heretofore paid by Lamm under the existing contract, and, on account of which, no timber has been cut.

Subsequent thereto the parties executed a contract, dated December 31, 1932, although actually signed April 25, 1933, which provided that upon approval of this agreement by the Long-Bell Lumber Co.'s trustee, the old agreement "shall become and be null and void and of no further force or effect, except that the Seller [Long-Bell Lumber Co.] shall retain as its own, without accountability to the Purchaser therefor, the sum of Two Hundred Thousand Dollars ($200,000.00) heretofore paid by the Purchaser to the Seller pursuant to the provisions of Article II of said agreement, and the Purchaser shall be under no further or any obligation to the Seller, and/or its assigns, or at all, on account of or growing out of said prior agreement."

The agreement provided, among other things, that 300,000,000 feet of timber should be cut and paid for at $3 per 1,000 feet, and that the Long-Bell Lumber Co. should receive additional stumpage payments from gross income and receipts, under circumstances not here material.

Based on the memorandum of December 8, 1932, petitioner's auditor at the close of the year 1932 prepared the following journal voucher, dated December 31, 1932:

Lamm Lumber Company
Journal Voucher                                          Date 12/31/32
Debit—New Long Bell cutting contract_____ $200,000.00
Credit  Stumpage_____ $200,000.00

Explanation—Attach all supporting papers to this voucher. By agreement of Dec. 8 – 1932 the initial advance of $200,000 in 1928 is recognized as a consideration moving to the execution of the new cutting contract and is therefore transferred to new a/c No. 483.

Petitioner has consistently treated the $200,000 as part payment for cutting rights to 300,000,000 feet of timber, and each year since 1932 it has charged off a proportionate part thereof, using a basic rate of 66⅔ cents per 1,000 feet of timber cut. For 1936 it charged off $28,130.50, based upon 42,195,760 feet of timber cut at 66⅔ cents per thousand.

OPINION.

Respondent denies that petitioner is entitled to write off the $200,000 payment under any provision of the statute, regardless of whether the amount written off be called amortization, depletion, or depreciation. He contends that the $200,000 was forfeited in 1932 or 1933 and that a tax deduction would be allowable only in the year in which the loss occurred.

Petitioner's position is that both parties to the original contract recognized the impact of the depression and the desirability of amending the original agreement so that cutting operations could be resumed. It points out that Long-Bell took no steps to cancel the agreement or to declare petitioner in default. Petitioner relies particularly upon that portion of the memorandum of December 8, 1932, which recites that the $200,000 payment should be retained by Long-Bell as part consideration of the new contract. It is urged that the $200,000 was retained by Long-Bell under the new agreement, which canceled the earlier contract, and that the amount retained represented cost to petitioner of the contract.

We can not agree with petitioner's contention. The memorandum must give way before the agreement signed April 25, 1933, by the contracting parties. What transpired between December 8, 1932, and April 25, 1933, we do not know, but the contract canceled the earlier agreement except as to the $200,000, which Long-Bell "shall retain as its own, without accountability" to petitioner therefor. In our opinion the final agreement constituted a mutual release of their rights by the contracting parties under the prior agreement except that the $200,000 paid by petitioner was forfeited to Long-Bell Lumber Co. We are unable to find any language in the amended contract indicating that the $200,000 previously paid represented the cost of the new contract. The consideration for the new contract was stated therein as $3 per thousand, plus additional stumpage payments under prescribed circumstances. On this issue the respondent is sustained.

*Issue 4.*

FACTS.

By the agreement of May 16, 1933, petitioner transferred certain personal property to the American Trust Co., hereinafter referred

to as the bank, and the other bank creditors, as collateral security for any new advances and as collateral security for any indebtedness, obligations, liabilities, or demands against petitioner then existing or thereafter created. The bank was authorized and empowered to treat the property deposited with it as virtually its own for the purpose of recovering the indebtedness owed it by the petitioner. In addition to the above personal property the bank held a $250,000 first mortgage on petitioner's real property and plant, which it renewed in 1935.

In the conduct of the business under said agreement the bank took warehouse receipts covering all of petitioner's lumber inventory. During the period 1933 to 1936, inclusive, warehouse receipts and/or trust receipts covered all of petitioner's lumber. Each month a new warehouse receipt was issued to the bank covering petitioner's lumber. As lumber was needed by petitioner the bank would release warehoused lumber under trust receipts which required petitioner to hold the proceeds in trust for the bank. The early trust receipts were issued for half a million feet, but the amount was gradually increased to as much as three million feet by 1940. The proceeds from petitioner's sales of lumber for 1936 were reported on its tax return as in excess of $976,000 and over $900,000 thereof was deposited with the bank.

From time to time after the bank assumed supervision of petitioner it advanced various sums to the latter as working capital. Any sums repaid by petitioner on its indebtedness were to be applied under the agreement as follows:

9. All sums received and applied by the Bank hereunder shall be first applied to the repayment of all sums advanced to the undersigned by the Bank subsequent to the date hereof and no such sums shall be applied to the payment of the sums now owing the above named three banks and hereinabove referred to until all sums advanced by the Bank subsequent to the date hereof, together with the interest thereon, shall be repaid in full. The Bank at its election is hereby authorized to release and return to the undersigned any security which may at any time be held by it hereunder and may return and pay to the undersigned for operating costs any sums that may come into its possession hereunder and shall not be obliged to apply the same to the debts herein set forth and the Bank shall not be responsible or accountable for the proper use of any such sums which may be so returned.

No part of the sums repaid were applied against petitioner's indebtedness of May 16, 1933, as long as any new advances remained unpaid.

At January 1, 1936, new advances by the bank to petitioner totaled $65,000. During 1936 petitioner paid $55,000 to the bank which was credited against the new advances. The sum repaid represented proceeds from sales of lumber in petitioner's inventory subject to warehouse receipts held by the bank. The total indebtedness of petitioner to the bank at January 1, 1936, was $395,000 direct, consisting of a

$250,000 first mortgage, $80,000 unsecured loans, and $65,000 of new advances, plus $10,169.41 indirect, which represented a trade acceptance discounted for petitioner.

During 1936 and prior thereto the bank exercised close supervision of petitioner's disbursements. At the beginning of operations under the agreement the bank received daily reports; later, it received weekly reports. Frequent conferences were held with W. E. Lamm by an official of the bank, who examined practically every transaction made by petitioner. Before any capital expenditure could be made permission had to be obtained by petitioner from the bank. The bank frequently limited petitioner as to the amount of inventory it might build up, and restricted the amount of cash salary that W. E. Lamm could withdraw from the business. Under the agreement the bank could at its election shut down petitioner's operations through a foreclosure, a calling of the loans, and a refusal of additional credit.

The agreement of May 16, 1933, contains no provision which expressly deals with the dispositions of petitioner's earnings and profits of the taxable year, or which expressly deals with the payment of dividends.

OPINION.

The issue presented by the pleadings is whether petitioner is entitled to a credit under section 26 (c) of the Revenue Act of 1936. Petitioner has argued the issue under the provisions of section 26 (c) (2), set out in the margin,[1] and we shall limit our discussion in accordance with the argument presented.

One of the conditions prescribed by statute for granting the credit is that there be a provision in a written contract executed prior to May 1, 1936, which "expressly deals with the disposition of earnings and profits of the taxable year." If the contract contains no such provisions, or if the contract fails to require earnings and profits "to be paid within the taxable year in discharge of a debt, or" etc., the credit can not be allowed. *Helvering* v. *Moloney Electric Co.*, 120 Fed. (2d) 617.

---

[1] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

* * * * * * *

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

* * * * * * *

(2) DISPOSITION OF PROFITS OF TAXABLE YEAR.—An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word "debt" does not include a debt incurred after April 30, 1936.

We do not understand petitioner to contend that its contract of May 16, 1933, "expressly" deals with earnings and profits of the taxable year. It contends that not only all earnings and profits of the taxable year were required to be paid to the bank, but its entire gross receipts as well; that after returning operating costs the bank was required by paragraph 9 to apply all sums to payment of advances made since May 16, 1933, and then to payment of debts existing on that date; that petitioner in fact paid $55,000 from the proceeds of lumber sales during the taxable year on its indebtedness; and that petitioner not only had no right to disburse any receipts to its stockholders until the bank was paid, but it had no possible opportunity to make any such distribution. Petitioner cites and relies on our decisions in *G. B. R. Oil Corporation*, 40 B. T. A. 738; *Strong Manufacturing Co.*, 41 B. T. A. 1273 (appeal pending, C. C. A., 6th Cir.); *Joell Co.*, 41 B. T. A. 825; and *Michigan Silica Co.*, 41 B. T. A. 511 (appeal pending, C. C. A., 6th Cir.). See also *Baltimore Steam Packet Co.*, 44 B. T. A. 629.

The various contracts considered in the cited cases use language which, while not expressly mentioning "earnings and profits" in so many words, yet was thought to be comprehensive enough in meaning to include "earnings and profits of the taxable year." Respondent's regulations, article 26-2 (c) of Regulations 94, likewise recognize that words of equivalent meaning can be used in a contract without defeating the credit, e. g., "net income", "net earnings", or "net profits." But no similar terms are to be found in the instant contract.

As a practical matter, the bank controlled the petitioner's operations without any express right to its earnings and profits. The bank protected itself by releasing lumber to petitioner under trust receipts and when the security was sold the proceeds came back to the bank. In this manner it actually acquired the proceeds of petitioner's sales, but it permitted the use thereof in petitioner's business so long as there was no deviation from the plan adopted to work out the indebtedness. Although the bank officials and petitioner conducted the business in such manner that the earnings and profits of petitioner were applied on the petitioner's indebtedness, such application was not required by any provisions of a written contract which "expressly deals with the disposition of earnings and profits of the taxable year." We can spell out no such provision in the contract of May 16, 1933.

Our examination and comparison of the contracts in the cited cases with the present contract convinces us that the cited cases are not controlling. The contract provisions here were drafted to insure payment from collateral deposited or to be deposited. The provisions thereof make no mention of earnings, net earnings, net income, profits, net profits, proceeds, net proceeds, or earnings and profits, nor is any similar terminology used indicating an intent to definitely tie earnings

to the payment of debts.    That such a policy may have been adopted or followed by debtor and creditor is immaterial.    Petitioner must establish its right to the credit by bringing itself strictly within the provisions of the statute.    *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U. S. 46.    On this issue we sustain the respondent.

*Decision will be entered under Rule 50.*