HELMS BAKERIES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PAUL H. HELMS AND PEARL E. HELMS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PAUL H. HELMS, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 102603, 102604, 102602. Promulgated February 11, 1942.

*Melvin D. Wilson, Esq.*, for the petitioners.
*E. A. Tonjes, Esq.*, for the respondent.

310

314

OPINION.

MELLOTT: The petitioner contends it is entitled to a credit for dividends paid in an amount equal to its adjusted net income of $77,675.52, under section 26 (c) (1) or (2) of the Revenue Act of

1936,[1] either by reason of a contract restricting the payment of dividends or by reason of a contract requiring a portion of its earnings and profits of the taxable year to be paid in discharge of a debt. It also contends that, in the event the preferred stock dividends declared and distributed by it during 1936 are held to be taxable, it is entitled to a credit for the purposes of the undistributed profits tax to the extent of the fair market value thereof under section 27 of the Revenue Act of 1936. The respondent concedes that the latter contention is sound.

Section 14 of the Revenue Act of 1936 imposes a surtax on the net income of a corporation not distributed in the taxable year. Section 26 (c) (1) allows as a credit, in computing the surtax, the adjusted net income which can not be distributed as dividends within the taxable year without violating a provision of a written contract executed by the corporation prior to May 1, 1936, expressly dealing with the payment of dividends. Section 26 (c), under which petitioner claims, grants a special exemption from tax and should, therefore, be strictly construed. *Pacific Co.* v. *Johnson,* 285 U. S. 480; *Helvering* v. *Intermountain Life Insurance Co.,* 294 U. S. 686; *Deputy* v. *DuPont,* 308 U. S. 488; *Helvering* v. *Northwest Steel Rolling Mills, Inc.,* 311 U. S. 46. It is necessary for petitioner to bring itself squarely within the statute if the claimed credit is to be allowed.

Petitioner was operating a rapidly expanding business and it was necessary to borrow large sums of money to carry on. In December 1935, it owed a bank a substantial sum and opened negotiations for an additional loan of $50,000. About December 5, 1935, Helms, president of petitioner, had a conference with a representative of the bank and an agreement was reached concerning the terms of the additional loan. The agreement made at that time was confirmed in writing and petitioner agreed to liquidate the total loan at the rate of $10,000

---

[1] SEC. 26. CREDITS OF CORPORATIONS.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account.

(2) DISPOSITION OF PROFITS OF TAXABLE YEAR.—An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word "debt" does not include a debt incurred after April 30, 1936.

per month plus interest. It also agreed "that no cash dividends will be paid until this loan is liquidated on the above terms." A portion of the loan was outstanding throughout the calendar year 1936. Payments at the agreed rate were made regularly during 1936.

Respondent contends that petitioner's contract with the bank only prohibited the payment of "cash dividends"; that it could (and did) distribute a stock dividend in 1936 without violating a provision of its agreement; and that under such circumstances the provisions of the law and the regulations [2] have not been met.

Petitioner contends that, since its preferred stockholders were entitled to cumulative cash dividends of $7 per share, as evidenced by the provisions as to dividends printed on the stock certificates, before any dividends could be paid on its common stock and since, in 1936, the accumulated dividends on its preferred stock exceeded its surplus, only "cash dividends" could be distributed without the consent of the preferred stockholders. It insists that since it could not distribute cash dividends in 1936 without violating its agreement with the bank. it is entitled to the credit granted in section 26 (c) (1).

The fact that the stockholders were the beneficial owners of the corporation and their interest was its interest can not be overlooked. Cf. *Henry Mill & Timber Co.*, 43 B. T. A. 1073. The preferred stock certificates did not constitute written contracts restricting the payment of dividends within the meaning of section 26 (c) (1). *Bishop & Babcock Manufacturing Co.*, 45 B. T. A. 776; *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, *supra*. The consent of petitioner's stockholders to receive a dividend in stock instead of cash in settlement of accumulated dividends was merely an assent to corporate policy by members of the corporate group. Whether such consent was necessary before petitioner could distribute stock dividends instead of cash is not material in determining whether petitioner's agreement with the bank is within the requirements of section 26 (c) (1). The fact that petitioner obtained such consent and dis-

---

[2] Article 26–2 (b) of Regulations 94 provides:

(b) *Prohibition on payment of dividends.*—The credit provided in section 26 (c) (1) is allowable only with respect to a written contract executed by the corporation prior to May 1, 1936, which expressly deals with the payment of dividends and operates as a legal restriction upon the corporation as to the amounts which it can distribute within the taxable year as dividends. If an amount can be distributed within the taxable year as a dividend—

    (1) in one form (as, for example, in stocks or bonds of the corporation) without violating the provisions of a contract, but can not be distributed within the taxable year as a dividend in another form (as, for example, in cash) without violating such provisions, or

    (2) at one time (as, for example, during the last half of the taxable year) without violating the provisions of a contract, but can not be distributed as a dividend at another time within the taxable year (as, for example, during the first half of the taxable year) without violating such provision—

then the amount is one which, under section 26 (c) (1), can be distributed within the taxable year as a dividend without violating such provisions.

tributed dividends in preferred stock, after refusal of the bank to waive the agreement prohibiting the payment of "cash dividends" until the loan was paid, is some evidence petitioner considered the agreement with the bank restricting dividends to extend only to "cash dividends." Petitioner construed its contract with the bank as not restricting its right to distribute additional stock to its stockholders and additional stock was distributed. To say that its contract prohibited the payment of all dividends within the meaning of section 26 (c) (1) in the face of its admitted action, is, to say the least, somewhat inconsistent. Moreover, since petitioner had outstanding in the taxable year both preferred and common stock it could have distributed a taxable stock dividend if it chose to do so. Cf. *Koshland* v. *Helvering*, 298 U. S. 441; *Sprouse* v. *Commissioner*, 122 Fed. (2d) 973. It, therefore, is not within the rule recognized by the Board in *Paraport Theatre Leasing Corporation*, 44 B. T. A. 108. Cf. Regulations 94, art. 26-2 (b).

Petitioner relies on *Columbia River Paper Mills*, 43 B. T. A. 263 (appeal pending C. C. A. 9th Cir.). In that case the taxpayer could not have made any distribution to its stockholders except in cash. In the opinion it was said: "We agree with the respondent that if a dividend could have been paid by the petitioner during 1936 in any form other than cash the petitioner has not brought itself within the letter of section 26 (c) (1) of the Taxing Statute." In the instant proceeding petitioner not only could have distributed a dividend in a form other than cash without violating a provision of a written contract, but it actually did so. It is obvious that *Columbia River Paper Mills* is distinguishable upon its facts and can not be regarded as controlling here. Petitioner has failed to bring itself within the letter of section 26 (c) (1) and its claim for credit under that subsection must be denied.

Petitioner's contention that it is entitled to a credit under section 26 (c) (2) is also untenable. Its letter to the bank in confirmation of the oral agreement, is the only written agreement in evidence and it provides only for the stepping up of payments on the loan from $8,000 to $10,000 per month, plus interest. It does not expressly deal with the disposition of earnings or profits of the taxable year, nor does it require that the monthly payments be made out of earnings and profits, or that earnings or profits be irrevocably set aside for the discharge of a debt. Cf. *G. B. R. Oil Corporation*, 40 B. T. A. 738; *Michigan Silica Co.*, 41 B. T. A. 511; affd., 124 Fed. (2d) 397; *Strong Mfg. Co.*, 41 B. T. A. 1273; affd., 124 Fed. (2d) 360; *Magnus Beck Brewing Co.*, 46 B. T. A. 78. The agreement to pay $10,000 per month merely fixed the amount of the monthly payments. It had nothing to do with the source from which the payments would be

made. A mere probability that a part or all of the monthly payments would be derived from earnings and profits is not sufficient to meet the requirements of the statute. *Belle-Vue Manufacturing Co.*, 43 B. T. A. 12; *Campbell Transportation Co.*, 43 B. T. A. 417 (on appeal C. C. A., 3d Cir.); *Van Ameringen-Haebler, Inc.*, 45 B. T. A. 1085. It is immaterial, therefore, that petitioner did in fact make payments out of current earnings. In order to be entitled to credit under section 26 (c) (2) it must bring itself precisely within the statute. This it has failed to do. Cf. *Helvering* v. *Moloney Electric Co.*, 120 Fed. (2d) 617; *Lamm Lumber Co.*, 45 B. T. A. 1; *Eastern Building Corporation*, 45 B. T. A. 188. The claimed credit under section 26 must therefore be denied.

The next question is whether the dividends in first and second preferred stock distributed by petitioner to the holders of its first and second preferred shares were taxable dividends within section 115 of the Revenue Act of 1936.[3]

Petitioner contends that the agreements of the preferred stockholders to exchange the certificates representing shares of the corporation for new certificates representing the same shares, to accept first and second preferred shares in satisfaction and payment of certain accumulated dividends, and to purchase one share of common stock for each share of first or second preferred stock received as a dividend, amounted to a recapitalization of the company and hence a reorganization and there was a nontaxable exchange of stock under section 112 (b) (2) or (3) of the Revenue Act of 1936. This contention is without merit. *Skenandoa Rayon Corporation*, 42 B. T. A. 1287; affd., 122 Fed. (2d) 268; and *South Atlantic Steamship Line*, 42 B. T. A. 705, cited by petitioner in support of this contention are distinguishable upon their facts. In each there was a recapitalization and reorganization in pursuance of a definite plan. Here there was no plan of reorganization, but only a plan to distribute a

---

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

\* \* \* \* \* \* \*

(f) STOCK DIVIDENDS.—

(1) GENERAL RULE.—A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution.

\* \* \* \* \* \* \*

(j) VALUATION OF DIVIDEND.—If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder.

dividend in first and second preferred stock in lieu of accumulated cash dividends. It is true that the old certificates were exchanged by the shareholders for new ones; but the question here is not whether there was any gain upon an exchange of shares. It is simply whether the distributions which were made are taxable as dividends under section 115 of the Revenue Act of 1936. We think that they were and accordingly so hold.

But, says petitioner, no substantial change was made in the proportionate interests of the stockholders and the distribution resulted in a mere proliferation within the rationale of *Eisner* v. *Macomber*, 252 U. S. 189. The cited case held that a dividend in the corporation's common stock distributed to the then common stockholders, which did not give such stockholders an interest in the corporation's assets different from that which they already had, was not income within the Sixteenth Amendment. The decision was based upon a broad perspective of the relations between a corporation and its stockholders. Following it, Congress, in the Revenue Act of 1921 and subsequent revenue acts, up to and including the Revenue Act of 1934, incorporated in the law a provision that: "A stock dividend shall not be subject to tax   *   *   *." In 1936 the Supreme Court in *Koshland* v. *Helvering*, 298 U. S. 441, laid down the rule that where a stock dividend gives the stockholder a proportionate interest in the net assets of the corporation different from that which his former stockholdings represented, he receives income which is taxable under the Sixteenth Amendment. Following the decision in the *Koshland* case, the Revenue Act of 1936 was enacted providing, in effect, that a stock dividend is taxable if it constitutes income to the shareholders within the meaning of the Sixteenth Amendment to the Constitution. (Sec. 115 (f) (1), Revenue Act of 1936.)

In *Helvering* v. *Gowran*, 302 U. S. 238, the Court had before it a case arising under the Revenue Act of 1928, where a dividend, payable in preferred stock, had been declared on common stock. It held that the common shareholder had received an interest different in character from that which his common stock represented and that the dividend was constitutionally taxable, although under the law as it existed at that time it was not subject to tax.

In *Sprouse* v. *Commissioner*, 122 Fed. (2d) 973 (C. C. A., 9th Cir.), a corporation distributed a 10 percent stock dividend in nonvoting common stock to holders of voting common and nonvoting stock. The petitioner owned only voting common stock prior to the declaration of the dividend. The court held that the real test whether such a distribution constitutes income is not "differences in such characteristics as preference in interest in assets and in dividends, and in the right to vote", but "whether the distribution effects a change in the

proportionate interests of the stockholders"; for example, "where the corporation has more than one class of stock outstanding, and distributes a stock dividend to one class only, then the proportionate interests in the corporation are changed, because the class of stockholders who receive the dividend then have a greater interest in the assets of the corporation than those who did not receive the stock dividend, *Koshland* v. *Helvering, supra.* There being a change in the proportionate interests, the recipients of the stock dividend have derived income."

In *Strassburger* v. *Commissioner*, 124 Fed. (2d) 315, affirming memorandum opinion of this Board, the court held that distribution of preferred stock to the sole owner of the common stock, which was the only class of stock outstanding, was income within the meaning of the Sixteenth Amendment. The rationale of the decision seems to be that the stockholder received property rights of actual and exchangeable value representing an interest different from that which his common stock represented.

In the instant proceeding there was outstanding first and second preferred and common stock. The corporation distributed first preferred stock to the owners of first preferred shares and second preferred stock to the owners of second preferred shares. No distribution was made to the owners of common shares. It is obvious the preferred stockholders received property rights of actual and exchangeable value which changed the proportionate interest in the net assets of the corporation as between the preferred and the common stockholders. This distribution was in our opinion a dividend and constituted taxable income to the shareholders within the meaning of the Sixteenth Amendment and under section 115 (f) of the Revenue Act of 1936. Petitioner is, therefore, entitled to a dividends paid credit under section 27 (e) of the Revenue Act of 1936 in the amount of the fair market value of the preferred stock distributed to its stockholders.

### Docket No. 102604.

The respondent included in the income of Helms and his wife for 1936 $50,900 representing the value of the first and second preferred stock distributed to them by Helms Bakeries, computed at $100 per share. Helms contends that the preferred stock was not income within the meaning of the Sixteenth Amendment. If it is held to be income, however, then he contends that the amount thereof should be determined to be the fair market value of the preferred stock which he received. This has been stipulated to be $90 per share for the first preferred and $25 per share for the second preferred.

It has been held that the preferred stock distributed by Helms Bakeries in 1936 was taxable income to the shareholders within the meaning of the Sixteenth Amendment and under section 115 (f). The corporation is being allowed a dividends paid credit equivalent to the fair market value of the stock at the time it was distributed. The respondent concedes that, if taxable as a dividend to the recipients, it should be included in their gross income at its fair market value at the time it was received by them rather than at par. This concession accords with our view of the law. The deficiency in this proceeding should therefore be recomputed, including in the income of Helms and his wife only the fair market value of the stock at the time it was received.

### Docket No. 102602.

The issues in the proceeding of Helms, trustee, are: (a) Was taxable income realized in 1936 through distribution to the trustee of the first and second preferred stock of Helms Bakeries? and (b) did respondent err in failing to find there were three separate trusts —one for each of the three children—instead of one trust for the three of them?

Issue (a) has already been discussed. For the reasons set out above it is held that the preferred stock was income for the taxable year to the extent of its fair market value at the time received.

The answer to the remaining question may be found by ascertaining the intention of the settlors of the trust. *Green* v. *Green*, 23 Wall. (90 U. S.) 486. The instrument which they signed is the best evidence. It should be examined from its "four corners." *McGinley* v. *Commissioner*, 80 Fed. (2d) 692; *Huntington National Bank* v. *Commissioner*, 90 Fed. (2d) 876. Evidence *aliunde* may be received to aid in the construction but not to contradict the plain and unambiguous language used. 65 C. J. 248. The only evidence offered or received in the instant proceeding bearing upon this issue was the testimony of Helms and his attorney upon which finding has been made that instructions were given to prepare three trusts, one for each of the children, and that the attorney, who drew up the instrument, advised Helms it created three separate trusts. Notwithstanding this evidence we choose to rest our conclusion chiefly upon the instrument itself; so it will be discussed at some length.

The trust estate (Two (b)) was to "be apportioned, segregated and divided into three equal shares", one for each child. The net income from each (Two (c), (d) and (e)) was to be "apportioned and segregated to and for the use and benefit of" each of the three named children. Under Two (f) "the share of the Trust Estate apportioned" to each child was to be treated separately in the event

of his or her decease and under Three, if "the income from the respective shares to which the respective beneficiaries may be entitled" should be insufficient for the purposes contemplated by the settlors, the trustee was to use "so much of his or her share up to and including the whole thereof, as the trustee may deem advisable." All of these provisions indicate that three separate trusts were created. The trustee so interpreted the trust instrument, signing separately, as trustee for each of his children, the consent to accept stock and, after it was received, allocated one-third of it to each of the children. Separate returns were filed by him for each of the children, listing therein one-third of the stock received as "stock dividends on stock held in trust for the beneficiary." Some of the circumstances set out above are only self-serving and have been given little weight. We are convinced, however, from an examination of the trust instrument, that three separate trusts were created and we so hold.

*Decision in each of the proceedings will be entered under Rule 50.*