W. C. Richards Co. (Inc.), and William C. Richards and Grace J. Richards v. Commissioner.
W. C. Richards Co. v. Commissioner
Docket Nos. 1295-63, 1296-63.
United States Tax Court
T.C. Memo 1966-171; 1966 Tax Ct. Memo LEXIS 112; 25 T.C.M. (CCH) 884; T.C.M. (RIA) 66171; July 21, 1966
*112 The petitioners filed a lawsuit in Chancery in the Superior Court of Cook County, Illinois against the Clark Oil & Refining Corporation. The case, prior to trial, was settled on the basis of the award of arbitrators, pursuant to an arbitration and settlement agreement. Held, under the agreement: (1) That the individual petitioners sold their improved real estate on Vermont Street to Clark, and Clark purchased it, for $222,500, the amount of the arbitrators' award and decision, which sum represented the replacement value and reproduction-new value of the Vermont Street land and improvements. (2) That the arbitrators awarded, and Clark paid, to the Richards Company the sum of $65,000 for specific purposes. (3) That no part of the total sum of $287,500 paid by Clark constituted a payment of, or in lieu of, damages. (4) That no income under the settlement award accrued in 1959 to Richards Company, but that such income as it realized thereunder accrued in 1960. (5) That the meeting of the directors of Richards Company was held in December, 1960, and was not held in 1961, at which authorization was given for the corporation's contribution to its profit sharing fund, and that a deduction *113 therefor in 1960 is allowable. Charles W. Davis, 1 N. La Salle St., Chicago, Ill., Frederick W. Hickman, and John L. Snyder, for the petitioners. Nelson E. Shafer, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The income tax deficiencies determined by the respondent in the case of the corporate petitioner are $136,760 and $114,669.62 for 1959 and 1960, respectively; and in the case of the individual petitioners, the deficiency is $102,415.22 for 1960. Respondent has made some determinations in the alternative which present a question relating to the year in which the corporation is required to report certain alleged income. There are two issues for decision: (1) The main issue is, briefly, whether the net sum of $287,500.00 paid by the Clark Oil *114 & Refining Corporation is taxable as ordinary income or long term capital gain, and what portion thereof is taxable to the individual taxpayers, and to the corporation. (2) Whether a contribution of the corporation to its profit sharing trust is deductible in 1960, rather than in 1961. Other determinations of the respondent have been settled by stipulations of the parties which will be given effect under Rule 50 computations. Findings of Fact W. C. Richards Co., filed its returns for 1959 and 1960, and the individual petitioners filed their joint return for 1960 with the district director of internal revenue in Chicago, Illinois. William C. Richards, hereinafter called Richards, was engaged in a sole proprietorship business in 1946 of fabricating metal and manufacturing toys. In 1946, Richards and his wife made a contract to purchase a piece of real estate, hereinafter called the Richards property, in the town of Blue Island, a suburb of Chicago. The purchase price paid was $15,000. The above-described business was conducted on the Richards property. In 1949 and 1950, Richards entered into another business, conducted on the same property which became his only business, the manufacture, *115 reclaiming, and reprocessing of paint. Beginning in 1950, Richards and his wife held title to the real estate under a land trust of which the Mercantile National Bank of Chicago was the trustee. Petitioner and his wife have been the owners of the real estate, called the Richards property, at all times up until the time it was transferred in 1960. This piece of real estate was transferred to Richards and his wife on August 31, 1946, and the final payment on the purchase price was made on December 31, 1953. In April 1950, the former owners of this piece of real estate, Ultsch, assigned to petitioners, under the land trust, their interest in an easement for a railroad track siding to the north of the property. The Richards property involved here consists of the real estate and the easement. The property is conveniently described by the address, 3108 Vermont Street, Blue Island. The land trust under which the real estate was held was land trust No. 888TA created under a trust agreement with the Mercantile National Bank of Chicago dated April 24, 1950. On March 18, 1960, a deed dated February 1, 1960, was recorded by the Recorder of Deeds of Cook County, Illinois, by which Mercantile *116 National Bank of Chicago, as trustee of land trust No. 888TA, conveyed the Richards real estate to Clark Oil & Refining Corporation. The issues in these proceedings relate to payments made by Clark Oil & Refining Corporation, hereinafter called Clark, under circumstances that are set forth hereinafter. W. C. Richards Co., Inc., an Illinois corporation, was organized by Richards on June 25, 1953. It is referred to hereinafter as the Richards corporation, or the corporation. Richards transferred to the corporation all of the assets of his paint business, conducted on the Richards real estate; but the real estate and the buildings located on it (a paint factory and subsidiary buildings) were not conveyed to the corporation. The real estate and buildings were leased to the corporation by Richards and his wife through Mercantile National Bank, as trustee. Under the lease, the corporation originally paid rent in the amount of $7,200 per year, and agreed to pay the costs of maintaining the premises and all of the buildings and improvements thereon. The Richards real estate is a small rectangular tract consisting of about one-half of an acre (0.6), having a frontage of 100 feet on Vermont *117 Street (also known as 131st Street) and extending 293 feet north. It is located in about the center and on the south side of a right-angled triangular area of land, which is bordered on the south by Vermont Street, on the West by Kedzie Avenue, and along the hypotenuse of the triangle, extending northeast, the tracks of the B. & O.C.T. Railroad are located. The distance between Vermont Street and the railroad track to the north is a little over 598 feet, where the Richards tract is located. The Richards tract is only 293 feet deep. The adjoining tract, to the north, is 305 feet deep. The Richards tract is a very small part of the whole triangular area, the dimensions of which are, roughly, as follows (including the Richards tract): 1,663 feet along Vermont Street; 1,159 feet along Kedzie Avenue; and 1,378 feet along the hypotenuse of the triangle where the railroad track is located. A railroad sidetrack is located on the Richards tract which extends north over the adjacent tract of land (305 feet deep) and connects with the B. & O.C.T. Railroad track. When Richards took possession of the Richards real estate in 1946, the larger triangular tract was largely vacant land, except for the *118 buildings on the Richards property (an abandoned factory which had been used for manufacturing acetylene), a storage building northeast of the Richards tract, a small refining operation over in the northwest corner of the triangular tract (about one block from the Richards property), and perhaps some other small buildings or tanks. The triangular area was and is an industrial area, and within it there were no barriers to close off and separate the small Richards tract from the rest of the larger tract. In 1946 and thereafter, the part of the larger triangular tract west of the Richards property was owned by Clark Oil & Refining Corporation and another refinery. Clark Oil & Refining Corporation (Clark) is a Wisconsin corporation which has its business offices in Milwaukee. It is engaged in the business of refining oil and producing gasoline. Its only refinery is located next to the Richards' property. It is licensed by Illinois to engage in the production, processing, refining, manufacturing, storing, and distribution of petroleum, gasoline, and other related products, in Illinois. These products are inflammable and explosive. Over a period of several years beginning about in 1949, *119 Clark, or its predecessor, or related companies, all of which are sometimes referred to collectively herein as Clark, gradually acquired all of the pieces of property in the triangular tract, other than the Richards property. By 1957, the Richards property was surrounded on the east, west, and north by Clark, and subsequently Clark acquired nearly all of the property facing on Vermont Street in the block to the south of the triangular tract, i.e., across the street from the Richards property. Clark erected various structures on the land which it acquired. A large catalytic cracker was erected immediately to the west of the Richards property in about 1952. Clark also constructed a "platformer" and storage tanks in the area to the west of the Richards property. In about 1957, another production complex was erected on the property immediately to the east of the Richards property. Beginning in about 1953, Clark expressed interest in purchasing the Richards property. Conversations were held with Clark officials, both in Blue Island and at Clark's main offices in Milwaukee at various times thereafter. Clark officials made it clear in these discussions that Clark was in the process of *120 expansion and needed the Richards property. At the time of the first of such meetings, the Clark operations adjacent to the Richards paint plant had not interfered substantially with Richards' operations, and Richards had not made any complaints about Clark's operations or its expansion, except for a complaint about catalytic fines, round, ceramic objects, which were emitted from time to time by the catalytic cracker and deposited upon the Richards property, which might cause a fire. In these negotiations the parties were agreed that the Richards should have a price for their property which would be sufficient to permit replacement of their investment without financial loss, but the parties were unable to agree on what that price should be. In 1954 the price Richards asked of Clark for the property amounted to $200,000, plus an additional amount equal to the liability for income tax which the Richards would incur on the sale. During 1954 or 1955, Clark officials tried to find a suitable plant site which could be purchased for use as new quarters by Richards. This search was made difficult by the structural requirements necessary for paint manufacturing, the desire for a comparable *121 railroad siding, and the fact that the Richards paint business could not legally be operated except in areas zoned for heavy industry. Consequently no such quarters were found. Subsequently Clark sent an architect and an engineer to Blue Island, to design a replacement for the Richards plant. The design rendered did not prove helpful. Clark officials stated repeatedly during these various negotiations for purchase of the Richards property that it needed the property for its own operations. The need so expressed is confirmed by an architectural drawing prepared in 1956 or 1957, which was obtained from Clark's files and introduced by petitioners in evidence, labelled "Proposed layout with Richards property." In 1956 Clark made an offer of $100,000 for the property and later the same year made another offer of $135,000. Both of these were rejected by Richards as inadequate to compensate for the value of the Richards property to the individual petitioners. Richards' estimate of a price which would adequately compensate them for the value to them was $275,000, without taking into account any tax payable on the transfer. In 1956 Clark threatened to remove a portion of the railroad *122 sidetrack on the Clark property north of the Richards property, on which the Richards had an easement, because the sidetrack was in the way of pipes which Clark wished to install. Richards advised an attorney to take steps to enforce the easement, and Clark did not tear out the track. On April 13, 1956, Clark executed a long-term lease of land in the large triangular tract, 6 acres, the Ketler tract, located on the east side of and adjacent to the Richards property. During 1956 and 1957, Clark erected on the Ketler tract to the northeast of the Richards property, an electrically operated fluid catalytic cracker at a cost of 6 million dollars. This plant (the cracker) was located diagonally across from Clark's principal electric power station supplying power to Clark's other refinery plants. That is to say; Clark could not move its principal power station, or plant, and since it had not acquired the Richards property, Clark was obliged to lay its power lines from its principal power station around and at the back of the Richards property in order to connect with the new electrically operated cracker. This involved an additional cost to Clark of $75,000, to circumvent the Richards *123 property, which would have been avoided if Clark had acquired the Richards property and located the new cracker on the Richards property. A cracker is the equipment in which cracking is carried out. Cracking is a process in which relatively heavy hydrocarbons (from petroleum) are broken up into lighter products (as gasoline and ethlyene) by means of heat and pressure and sometimes catalysts. Catalytic cracking is the cracking of petroleum oils especially for the production of high-octane gasoline in the presence of a catalyst (as clay) in various forms (as pellets or beads either stationary in a fixed bed or moving through the oil). The growth of the Clark operations was of serious concern to the Richards corporation and Richards in 1956. In 1957, the anxiety increased after the new cracking plant was constructed because Clark's operations created the danger of fire on the Richards property. The use and enjoyment of the Richards property were adversely affected by the emission of gas, smoke, and acid fumes from Clark's cracking plant; by the deposits of catalytic fines (hot ceramic balls) on the Richards property; by the emission of oil sprays from the Clark operations onto the *124 Richards buildings and the cars of its employees; by Clark's grading of the land to the east of the Richards property (in connection with the construction there) in such a way as to cause water to drain off onto the Richards property; and by the very substantial noise and vibration resulting from the close proximity of the Clark production complex to the Richards property. The following are examples of the nuisances of the Clark operations to the Richards corporation and property: In 1956, a fire was ignited on the Richards property during construction undertaken by Clark on the property directly to the north of the Richards property. Sparks from a welder's torch landed on and started a fire on the Richards property. Fire was a rather frequent occurrence at the Clark refinery itself, and Clark had its own fire department. There were fires in 1958 and one in 1959 on the Clark property, close to the Richards property. On one occasion fire material from a fire on the Clark property spread onto the Richards property causing a solid wall of fire 20 feet by 50 feet adjacent to the storage tank on the Richards property. During one of the most serious fires pigment bags were burned and tanks *125 were scorched at the Richards plant. Within a few hours after another fire on the Clark property controls on a boiler on the Richards property failed to operate, requiring replacement of the boiler by Richards corporation at a cost of about $5,000. However, it is not clear that the loss of the boiler was due to the fire on the Clark property. On a number of occasions, gas and smoke were emitted from the Clark refinery in such quantities as to fill the buildings on the Richards property; and at times, when the windows were open, the acid fumes from the Clark refinery entered the Richards plant to such an extent that the employees had to suspend work. On occasions when catalytic fines were deposited over the Richards property, walking on the railroad docks where the fines were deposited became dangerous. From time to time, oil and oil products were deposited on the employees' cars and the buildings on the Richards property. When Clark was so advised, it took steps to remove these deposits from the cars. After acquiring possession of the property to the east of the Richards property in 1956, Clark began to construct in 1957, another production complex. By 1957, Clark's refinery had *126 expanded to both the western and northern boundaries of the Richards property. In the process of the construction, the grade of the Clark land east of the Richards property was raised 3 to 5 feet, and the land to the north of the Richards property also was raised. As a result, rain or waste water drained onto the Richards property, and at times the parking area there became flooded and the ground became extremely muddy. The floor of the maintenance shop, unlike the main building on the Richards property, was not raised to the level of the railroad car-loading platform and motors and equipment on the floor of the shop were damaged, but were cleaned and repaired. The Richards corporation had to retain the servives of a plumber to install a sewer drain in the parking area to eliminate some of the water, at a cost of about $300, and had to purchase gravel for the parking lot at a cost of $100. The disturbances to the Richards property constituted trespasses by Clark against the undisturbed use of the Richards property by the Richards corporation, but there were not any losses and damages thereto, other than minor ones. The repair of the boiler at $5,000 may or may not have been caused *127 by a fire on the Clark property; the cost of fixing the parking lot was only about $400; additional labor expense was not incurred by the Richards corporation; its paint inventory was protected because it was kept in tanks or drums; and no entries were made on the corporation's books for losses or damages caused by Clark's operations other than the 3 items mentioned above. Neither Richards nor the corporation claimed any casualty loss deduction during the years 1953-1960 by reason of damage inflicted upon their property by Clark. There were no disturbances to the enjoyment of the use by the petitioners of the Richards property other than as described hereinabove. After Clark's threatened removal in 1956 of the railroad sidetrack to the north of the Richards property (despite the easement held by Richards), and the fire caused by Clark's construction to the north of the Richards property, Richards asked an attorney, Otto Oplatka, whether he could obtain relief from the disturbances to the use and enjoyment of his property. Oplatka recommended another attorney, Russell Topper, who was employed by Richards late in 1957. Richards, having concluded that Clark would not voluntarily agree *128 to pay a price for the Richards property which would be satisfactory to the Richards, believed that by bringing a lawsuit, based on the disturbances described above, the matter could be brought to a head and an agreement made on a price for the Richards property. Richards made it clear to Topper that he wanted to precipitate a sale. Topper advised Richards to wait several months before instituting an action, in the hope that it would be possible during that time either to complete negotiations to sell the property or to compile a larger body of incidents of damage. But negotiations were not renewed and Topper advised Richards to file a lawsuit. In Topper's opinion, actual damages to Richards and his corporation had been caused by Clark's operations. Although there had never been any serious damage to the property, the Richards' use and enjoyment of their property had been seriously impaired by the incidents and conditions described above. The constant threat that a flash fire on the premises of Clark, or that a spray of hot oil might ignite a serious fire on the Richards property, where a large quantity of combustible materials was located, were serious. Topper believed that the *129 complaint in the lawsuit described later stated a legitimate cause of action and that he was confident the petitioners would be successful if the case went to trial; and that perhaps they would not obtain an injunction, but, at least, they would obtain an award of damages in exchange for a court order allowing Clark to continue its past actions of infringing on the property rights of Richards. On July 29, 1958, Richards corporation and Richards and his wife filed a lawsuit against Clark and certain of its officers in the Superior Court of Cook County, Illinois (In Chancery), Docket No. 58 S 11651. In the initial pleading, entitled "Complaint for Injunction", the plaintiffs in that lawsuit alleged, in substance, that the disturbances to the use and enjoyment of the Richards property, described hereinabove, constituted nuisances, trespasses, and wrongful acts. The plaintiffs asked for an injunction against the alleged nuisances and trespasses, and for a recovery of one million dollars in damages. The "Complaint For Injunction" is incorporated herein by reference. Topper believed that as of the time of commencement of the suit, he had no firm basis for actually assessing the alleged *130 damages in terms of dollar amounts. His purpose in alleging damages in such a large amount was "to enlarge the probability of selling the property to Clark Oil". Moreover, it is a common and justifiable practice to use a large figure in the ad damnum clause in pleadings. Topper also believed that in bringing the suit the prime purpose was to compel through these proceedings Clark's further consideration of purchasing this property at a reasonable price. His use of the million dollar damage figure also was prompted by his view that the chancery court might refuse to grant an injunction seriously curtailing the operations of Clark, but might assess damages based upon giving to Clark, in accordance with Illinois law, a right or easement to continue to infringe on the use of the Richards property. On September 25, 1958, Clark and the other defendants filed a verified answer in response to the Complaint for Injunction; the answer is incorporated herein by reference. In the answer, after denying that any nuisances, trespasses, or wrongful acts had been committed, the defendants alleged in paragraph 11 thereof that the damages suffered by plaintiffs were inconsequential and not actionable *131 under the maxim de minimis non curat lex. The defendants alleged in paragraph 12 that the plaintiffs were chargeable with the knowledge that "as Defendants' business prospered and grew, normal expansion and extension of Defendants' refinery installations and necessary attendant equipment would occur and could only occur in the manner which has transpired * * *." The defendants further alleged: That the Defendant has discussed with the Plaintiff the possibility of purchasing Plaintiff's property and in connection therewith have made every effort possible to accomplish the removal of Plaintiff's business from the near vicinity of Defendants' refinery. That Defendant has gone so far as to employ, at considerable expense, a licensed architect to design a paint manufacturing factory for the Plaintiffs of modern, technically proper design and to procure for the Plaintiffs' use a larger, more advantageous and commodious parcel of land upon which to construct said factory. Defendant has offered to build this factory and to move the Plaintiff's place of business to it at Defendants' sole cost, that Plaintiffs have refused every offer of Defendant. That as Defendants' business has expanded, *132 Plaintiffs' demands have increased. That Plaintiffs, although it has alleged that its property has depreciated in value because of Defendants' installations, has refused a bona fide offer of one hundred thousand dollars ($100,000) for property for which it paid seventy-five hundred dollars ($7,500) eight years ago. On November 14, 1958, the petitioners (as plaintiffs in the Superior Court proceeding) filed a motion to strike answer, raising procedural objections to the answer which are not relevant to the instant income tax proceeding. On April 24, 1959, Judge John A. Sbarbaro, the judge in the Superior Court Chancery proceeding, entered an order striking paragraphs 5, 5(a)-5(g), 6, 9, 11 and 12 of the answer as inadequate under the Illinois procedural law. Defendants were given leave to file an amended answer or an amendment to the answer on or before May 10, 1959. The defendants failed to file an amended answer within the time prescribed. On June 3, 1959, petitioners filed a motion to default the defendants for failure to file a pleading or otherwise proceed, and for the court's issuance of a temporary or interlocutory injunction or restraining order against Clark. On June 12, 1959, Clark *133 and the others filed a verified amended answer, (which is incorporated herein by reference) in response to petitioners' Complaint for Injunction, in which they again denied that any nuisances, trespasses, or wrongful acts had been committed; defendants alleged in paragraph 14 that the loss of profits from the operations of defendants' refinery which would result from the issuance of an injunction would be in excess of $25,000 per day; and they further alleged in the same paragraph: Defendants have offered and are willing to purchase plaintiffs' alleged premises at a price sufficient to enable the plaintiffs to remove their business to a location more suitable therefor, and to compensate plaintiffs for the depreciation in value, if any, caused by the expansion of defendants' refining operation; and to further evidence the defendants' good faith, the defendant Clark Oil & Refining Corporation is willing to have a competent, disinterested appraiser evaluate plaintiffs' alleged property and to pay therefor the sum fixed by such appraisal in addition to such moving costs as may be incurred by plaintiffs in moving to a new location. On June 3, 1959, immediately following the hearing *134 on the motion to default, Topper had a discussion with Erwin Roemer and Norton L. Penney, attorneys for Clark, in Judge Sbarbaro's chambers. Judge Sbarbaro had indicated at the hearing that he might issue the injunction, despite the hardship to the defendants. At this conference in chambers, one of the attorneys for Clark stated to the court that he thought the matter should be settled. Roemer described the importance of the matter and the danger involved. He told the court that Richards had been negotiating with Clark for the sale of the property and that Clark was willing to buy the property. He suggested that the court and Topper consider a method for determining the purchase price for the property; stated that negotiations so far had not produced a price because Richards was asking too much, and suggested that impartial people be selected to determine a price, and that there should be a plan to determine what elements should be considered in arriving at a price. In response to the court's question as to what Topper thought of the suggestion, Topper stated that it sounded like an excellent idea. Within a few days, a meeting was held at Roemer's law office, attended by Topper, *135 Oplatka, Penney, and Roemer. Roemer opened the discussion, and said that the matter had to be settled; he asked Topper what the asking price for the Richards property might be; he suggested arbitration if the parties could not agree upon a price; he referred to the dangers implicit in the physical relationship of the Clark and Richards properties, and said, "we need the property." He also said that Clark had plans for integrating the Richards property into Clark's operations. Topper stated that he felt that a reasonable price would be around $350,000. The parties agreed to a plan for arbitration, since Clark was unwilling to pay the above amount. Topper suggested that Roemer draft an arbitration agreement and send it to him. Roemer suggested the elements or items which should be considered in determining the price of the Richards property at this meeting, and these were later incorporated in the arbitration agreement described below. Attorneys' fees, which were included later as an element to be considered, were not mentioned at this time. Clark's counsel prepared a written memorandum, which Roemer sent to Topper, which evolved into an agreement, dated July 24, 1959, to resolve the *136 problem through arbitration. This agreement is called the arbitration agreement. The arbitration agreement of July 24, 1959, was signed by the plaintiffs and defendants and was filed in the equity action in Chancery, in Docket No. 58 S 11651 in the Superior Court of Cook County. It is incorporated herein by reference. The provisions of the arbitration agreement, are, in material part, as follows: A pretrial conference was held today in the chambers of Judge John Sbarbaro at which a general discussion took place and the possibilities of an amicable settlement explored. Mr. Irving H. Dawes, Executive Vice President of the defendant company, stated to Judge Sbarbaro that defendants recognized that plaintiffs' plant was in a very unhappy location; it being entirely surrounded by the oil refining plant of the defendant company. Mr. Dawes stated that defendants were willing to co-operate in the relocation of plaintiffs' factory; and to that end, defendants were willing to pay a lump sum to the plaintiffs comprised of the following items: 1. The cost of a new location for plaintiffs' presently located factory, not to exceed 1.5 acres in size and comparable to the value of the real *137 estate in the vicinity of plaintiffs' present plant. 2. The cost of erecting a new building at the new location comparable in size, type of construction and utilities and improvements to the land as now located on plaintiffs' property. 3. The cost of moving plaintiffs' equipment, machinery, fixtures, stock, inventory and all personal property from its present location to the new location and setting it up for practical operation in plaintiffs' business. 4. Any loss of net profit to plaintiffs caused by the time required to move plaintiffs' equipment, machinery, fixtures, stock, inventory and all personal property from its present location to the new location and setting it up for practical operation in plaintiffs' business. 5. Reasonable attorneys' fees incurred by plaintiffs in connection with this suit, the amount to be fixed by Judge Sbarbaro. In order to determine the amount of the several items and the total sum to be paid by defendants to plaintiffs it was proposed that plaintiffs and defendants each nominate some competent person in the contracting or appraisal business, and that a third competent person in the contracting or appraisal field be selected in the following *138 manner: The agreement provided that Judge Sbarbaro would select the third, neutral arbitrator from a list of 10 persons, of which each party to the litigation was to submit a list of 5 nominees. The arbitrators were to determine the amount to be paid by Clark under each of the first four items listed in the agreement, the total of which would represent Clark's total payment before the amount of attorneys' fees to be paid by Clark. The arbitration agreement provided further, as follows: * * * The decision of a majority of the said three arbitrators namely, the contractor named by the plaintiffs and the contractor named by the defendants and the neutral person selected by Judge Sbarbaro, shall be binding upon the parties. The arbitrators shall be selected within ten (10) days from the date hereof and they shall render their decision within one hundred twenty (120) days from the date of their appointment. Additional time, if necessary, shall be granted upon oral or written request of the majority of the arbitrators. The final decision of the arbitrators shall be in writing and signed by said selected arbitrators or a majority thereof as shall approve the decision. The parties *139 shall be notified in writing of the decision not later than two (2) days after its rendition and by delivery of a copy thereof to the respective attorneys of record for the parties hereto. Upon the payment by the defendants to the plaintiffs of the lump sum fixed by the majority of the said panel of three, and the amount fixed by Judge Sbarbaro under item 5, plaintiffs agree to convey to the defendants by good and sufficient warranty deed the property now occupied by it for plaintiffs' paint business, and at the same time plaintiffs shall deliver to defendants a general release of all damages or injury they may have suffered in the past because of the alleged wrongs of the defendants. Payment of the said total sum shall be made within thirty (30) days from the date of the aforesaid decision. A reasonable additional time shall be granted upon oral or written request of Judge Sbarbaro. Each party shall pay the expense of its own arbitrator and the balance of expenses incurred under this agreement shall be borne equally by the parties. Plaintiffs and defendants will permit full access to their respective properties by any or all of the said arbitrators for the purpose of making the *140 necessary appraisals. Upon the conclusion of the said settlement agreement the parties will stipulate to a dismissal of the said suit in equity with prejudice. The arbitration agreement later was modified by letter, which provided that Richards and the Richards corporation would be allowed a period of 9 months, after the time of the delivery of the deed to the Richards property to Clark, within which to move from the property. The following are the 3 arbitrators who were selected: Clark selected Sumner Sollitt of the Sumner Sollitt Company. The Richards selected The Austin Company. Judge Sbarbaro selected Ragnar Benson, Inc. As the next procedural step, Clark and the others filed in the equity action on September 9, 1959, a memorandum in opposition to the plaintiffs' motion for a temporary injunction. Each arbitrator prepared a separate report in which he (or it) determined the amount to be paid by Clark under items 1 through 4 set forth in the arbitration agreement, supra. These 3 reports are exhibits 31, 32, and 33; they are incorporated herein by reference. In the report of The Austin Company, engineers and builders, it was stated, inter alia, that it was believed that *141 the Richards Company would experience difficulty in finding a suitable 1 1/2 acre site, properly zoned, in the vicinity of its present plant. Since the individual arbitrators arrived at different dollar amounts for the 4 items involved, a majority report was required. Ragnar Benson, Inc. and The Austin Company agreed upon the amounts to be paid by Clark, excepting attorneys' fees. Sumner Sollitt did not agree with the majority. The majority decision of the arbitrators was that the total amount to be paid by Clark, except attorneys' fees was $287,500, which amount was $12,500 more than the largest total sum arrived at by Ragnar Benson, Inc. in its individual report. The majority decision, dated November 24, 1959, was filed with Judge Sbarbaro and made part of the record in the equity action. The majority decision of the arbitrators, addressed to Judge Sbarbaro, is in material part as follows: In accordance with instructions in your letter of October 16, 1959, relative to the appraisal in the above case. The majority decision of the arbitrators is as follows: 1. The cost of land for new factory
site
$ 62,500.00
2. The cost of erecting a new build-
ing at new location including
site improvements
160,000.00
3. The cost of moving equipment,
machinery and personal prop-
erty and setting it up in new
location
33,000.00
4. Loss of profit caused by the mov-
ing of factory
32,000.00
$287,500.00
*142 The majority decision of the arbitrators on the 4 items submitted to them for decision represented the award, exclusive of attorneys' fees, to the plaintiffs in the equity action which Clark agreed to accept by the terms of the arbitration agreement, supra, and the parties thereto were bound by the majority decision. The Superior Court subsequently entered an order incorporating the award of $287,500, plus attorneys' fees, to the plaintiffs. That order was not entered, however, until March 17, 1960. The arbitrators' award on November 24, 1959, of $287,500, was in excess of but fairly close to Richards' estimate in 1956 of the cost of replacing the land and buildings used by the Richards Company on Vermont Street, which estimated cost in 1956 of replacement and moving was $275,000, without taking into account any income tax upon Richards that would be involved. Richards had advised Clark in 1956 of that estimate. In 1954, Richards had asked Clark to pay $200,000 for the Richards property, plus an additional amount to equal Richards liability for income tax incident to the proposed sale of the property to Claik. During the period between 1954 and 1959, land prices in the area of *143 the Richards property on Vermont Street had increased because of publicity about the following: the Dan Ryan Expressway from the Loop in Chicago to the south side of Chicago, the widening of the Sag Canal, and the opening of the Canal Harbor as an international waterway port. In addition, there had been adverse publicity about fires involving paint manufacturing properties in the City of Chicago, which made it difficult for Richards to locate a new property to which the Richards paint business could be moved. At first, the village of Alsip, Illinois (to which the Richards factory eventually moved) refused granting permission to Richards to operate a paint manufacturing business there. After the filing in The Superior Court of a petition to fix attorneys' fees by the plaintiffs on January 25, 1960, the filing of defendants' response on February 11, 1960, and the filing on February 16, 1960, of plaintiffs' reply thereto, Judge Sbarbaro, in a letter dated February 18, 1960, determined that $35,000 should be paid by Clark as the reasonable amount of the attorneys' fees incurred by the plaintiffs (petitioners here) in connection with the action in equity against Clark. Accordingly, the *144 total sum to be paid by Clark under the arbitration agreement was $287,500, plus $35,000, or $322,500. The following relates to the petition and response filed in The Superior Court relating to the fees of the plaintiffs' attorneys to be fixed by the Court and paid by Clark. In the defendants' response to the plaintiffs' petition for the court's determination of fees allowable to attorneys of the plaintiffs, the following was stated in part in paragraphs 2 and 3: The settlement award agreed to by the defendants in pursuance of their agreement with plaintiffs in no way represents a determination of the damages, if any, suffered by plaintiffs as a result of defendants' alleged acts, but rather represents the attitude of the defendants that it would be better to buy out the plaintiff's present location rather than engage in a protracted litigation involving issues which are difficult to resolve. The sum awarded to the plaintiffs by the Board of Arbiters represents an amount calculated to enable plaintiffs to remove their entire business from its present location without any inconvenience or loss of profits to themselves. Defendants agreed to have such an amount determined and paid *145 to the plaintiffs because they believed this would be appropriate from a public relations standpoint and would achieve the desirable result of integrating plaintiff's premises into their own thereby eliminating the mutual inconvenience of having an unrelated manufacturing establishment located in the very midst of and surrounded by their oil refinery. The figure determined by the Board of Arbitration, therefore, in no way relates to a 'recovery' and is not in itself a proper basis for determining attorneys fees either by way of a percentage thereof or otherwise. * * * It was not the intention of the parties to the settlement agreement that either plaintiffs or their attorneys should be benefited as if all issues in the litigation had been resolved in their favor. Rather it was contemplated that the plaintiffs received full compensation for the value of their premises and the cost relocation without reference to any damages to which they might have been entitled as a result of judgment in the litigation, and it was further contemplated that the plaintiffs' attorneys should be awarded fees representing the time and effort spent in negotiating the settlement itself. [Emphasis *146 supplied.] The court extended the time for the payment of the award determined under the arbitration agreement to January 25, 1960, by an order filed on December 23, 1959, but the whole matter was not closed until March 17, 1960. During the period up to that date the following steps were taken and various matters occurred: The Richards corporation had made and paid for some improvements of the factory building during the period of the corporation's occupancy; and Richards had made and paid for most of the reconditioning of the building on the Richards property to adapt it to use in the paint business. The petitioners' accountants, Arthur Andersen & Co., inspected the bookkeeping records and tax returns of Richards, and the Richards corporation, and the records of the trustee of the land trust, to ascertain the respective total amounts of money expended by Richards and the corporation for building improvements. On January 5, 1960, Andersen advised both Richards and the corporation that of the total cost of the building and improvements 94.52 percent had been paid for by Richards (and his wife), and 5.48 percent had been incurred and paid for by the Richards corporation. Andersen *147 also advised Topper, the attorney for Richards in the action against Clark. As of January 25, 1960, a deed and money escrow with the Chicago Title and Trust Co. was executed by the respective attorneys for the plaintiffs and defendants providing for the following: for the deposit in escrow by the plaintiffs (petitioners here) of a warranty deed from Richards and his wife to Clark Oil & Refining, grantee, conveying the Richards property; and for a deposit by Clark, the grantee, of a check for $287,500, and for Clark's agreement to deposit an additional sum for attorneys' fees. Clark deposited $287,500 in the escrow on about February 1, 1960, and $35,000 for attorneys' fees on March 11, 1960. The Mercantile National Bank of Chicago, trustee, deposited in the escrow a deed to the Richards property from the Richards to Clark dated February 1, 1960. On March 17, 1960, Clark filed a petition in the Superior Court requesting a court order requiring the plaintiffs to pay rent for the occupancy of the Richards property at the rental of $7,000 per month from January 25, 1960, until the time they would vacate the premises. Plaintiffs filed their answer on the same date, and Topper stated *148 to the court that if the requested rental was representative of the true value of the property, then the plaintiffs wished to revoke the arbitration agreement since such proposed rent represented a value of the property greatly in excess of the arbitrators' award. The court denied Clark's petition for rent on the ground that the arbitration agreement established the plaintiffs' right to occupy the premises for 9 months. On March 17, 1960, the court entered an order in the equity action approving and finding the following approving the arbitration or settlement agreement of July 24, 1959; approving the determinations by the board of arbitrators on November 24, 1959, finding that $287,500 should be paid by the defendants to the plaintiffs for items 1-4 in the written arbitration or settlement agreement; approving Judge Sbarbaro's award on February 18, 1960, of $35,000 to be paid by the defendants to the plaintiffs for plaintiffs' attorneys' fees under item 5 of the agreement; finding that the capital contribution of the Richards, individually, to the purchase of the Richards property was 94.5 percent; that the capital contribution of the Richards Company was 5.5 percent; and that the *149 Richards and the corporation were "entitled to participate in the total distributable net proceeds in accordance with the above percentages." The order provided that payment of 94.5 percent of the net monies available should be made to Richards and his wife, and payment of 5.5 percent thereof should be made the Richards Company. On March 17, 1960, after the hearing on the above-described court order, Topper, plaintiffs' lawyer, and Norton Penney, one of Clark's lawyers, went to the Chicago Title and Trust Company to complete the last steps of the closing. Supplemental instructions to the escrowee were prepared directing it to do the following: To accept $35,000 from Clark in payment of fees for the plaintiffs' attorneys; to disregard Richards' insurance policies, which had been required under the original escrow agreement; and to purchase and affix $11.00 in revenue stamps to the deed. The supplemental instructions to the escrowee are in the handwriting of a clerk who then was employed by the Chicago Title and Trust Company, Mrs. Shandel, who was deceased at the time of the trial of these cases. Revenue stamps in the amount of $11.00 are required under section 4361 of the Internal Revenue Code *150 of 1954, for a conveyance of real property having a value of $10,000. Topper did not tell Mrs. Shandel to buy and affix to the deed $11.00 of revenue stamps; he did not know what amount of revenue stamps was required in the transaction. Topper specializes in trial work and is not engaged in the practice of Federal tax law or real estate law. Penney does not know who suggested the instruction to affix $11.00 of revenue stamps to the deed. Clark deposited $322,500 in the escrow. The various charges and expenses disbursed by the escrowee aggregated $84,028.66, for delinquent property taxes, prorations chargeable against the seller (reduced by the prorations chargeable to the buyer), title costs, revenue stamps, and payment in full of the fees of the plaintiffs' lawyers. The net amount of the funds deposited by Clark remaining for distribution to the Richards, individually, and to Richards Company was $238,471.34, of which 94.5 percent, or $225,355.42, was distributed to the Richards, and 5.5 percent, or $13,115.92 was distributed to the Richards Company. The distributions were made in March 1960. The following is a schedule setting forth the above details: Deposited in escrow by Clark
$322,500.00
Less charges and fees
84,028.66
Net distributable proceeds
$238,471.34
Prorata distributions to plaintiffs
of net proceeds: W.C. and G. Richards, 94.5%
$225,355.42
Richards Company, 5.5%
13,115.92
$238,471.34
*151 The plaintiffs incurred and paid out of the escrow deposits fees of their attorneys in the amount of $45,625, which was in addition to the $35,000 paid by Clark, so that Topper and Oplatka received the total sum of $80,625. The plaintiffs (petitioners here) executed a Release and Waiver of Future Claims dated March 10, 1960. Under the release and waiver, the plaintiffs released all claims arising out of the facts upon which the equity action against Clark had been predicated, and further released any claims based upon trespasses and nuisances which might arise thereafter. The Richards property was accordingly duly conveyed by Richards and his wife to Clark Oil & Refining Corporation by the warranty deed dated February 1, 1960. The equity action in the Superior Court of Cook County of the plaintiffs against Clark and others, Docket No. 58 S 11651 was terminated after and upon the entries of the above-described Release and Waiver of Future Claims on March 10, 1960, a stipulation of the parties to dismiss the action which was executed on March 24, 1960, and was filed with the court on September 8, 1960; and the order of the court dismissing the action which was entered on September 8, 1960. The *152 court in its order dismissing the suit "with prejudice" made the following findings: 1. That the Complaint of Plaintiffs alleges that the Defendants have created and maintained certain continuing and permanent trespasses and nuisances damaging Defendants' property, which trespasses and nuisances are of a private nature and are more particularly described in the allegations of said Complaint, and that the Answer of the Defendants denies said allegations; and 2. That the parties hereto by agreement and through special arbitration have compromised, adjusted and settled all issues raised by the pleadings, or which could be raised on allegations made therein, and that an award made by said Board of Arbitrators in discharge and compromise of said rights has been paid to the Plaintiffs. Prior to the dismissal of the suit on September 8, 1960, Clark's lawyer, Norton Penney sent a letter to Topper dated August 16, 1960, inquiring about the date when Richards Company intended moving, in which he stated in part: You and your clients should know, and are now put on notice, that Clark after having paid the sum stipulated has made definite plans for the utilization of the premises, including *153 construction of underground piping, wiring and concrete work. The inability to go forward with these plans is causing monetary loss to our client. Topper answered Penney by a letter dated August 26, 1960, explaining what was involved in the relocation. In a letter to Penney, dated August 2, 1960, 4 months after the escrow was closed, Dawes, a vice president of Clark, stated: Our tax people advise me that the statement by the Escrow Department of Chicago Title and Trust Company, which I enclose herewith and which is escrow No. 250543, is so drawn as to infer a sale to the Internal Revenue Department. The statement uses such words as "buyer's charges", "seller's charges" and "net proceeds of sale". We should like this statement redrawn, as it will become a part of the records, both in this office and the office of the Chicago Title and Trust Company. If this can be done the original statement should be withdrawn from the Chicago Title and Trust Company folder and the new statement submitted. Without notice to the Richards or their lawyer, Topper, the escrow statement in Escrow No. 250543 of Chicago Title and Trust dated March 23, 1960, "In account with Topper-Penney, re *154 Settlement of Richards et al. vs. Clark Oil et al.", was modified by drawing ink lines through certain typed words and writing in ink above the typed words different details. The typed words that were lined out are "buyer's", "sellers", and "sale". The words, "Clark Oil & Refining title" were written by hand over "buyer's", to read, "Clark Oil & Refining title charges"; the words written above "sellers" then read, "Richards title charges"; and the hand written words over "sale" (in 2 places) then read, "W. C. Richards Company - payment in full their share (5.5) net proceeds of [sale] settlement & transfer of ppty", and "William C. Richards & Grace J. Richards - payment in full their share (94.5) net proceeds of [sale] settlement." However, in one place on the escrow statement, item 2, through oversight, the word "buyers" was not lined out and the words, as originally written, remained, "less buyer's charges." In Schedule D of their joint income tax return for 1960, the individual petitioners (Richards and his wife) reported the transfer of the Richards property as a sale of a capital asset resulting in a long-term capital gain of $215,730.65, of which $107,865.33 was taken into *155 account as taxable income (which, as stated later, respondent did not accept and eliminated). The parties are agreed that the adjusted basis of the property at the time of the transfer was $12,569.43. The petitioners, on their tax return, computed the capital gain from the sale in the following way: Cash distributed from escrow
$225,355.42
Plus: Net prorations
$1,582.24
Delinquent taxes
1,591.92
3,174.16
$228,529.58
Less: Expenses of sale
229.50
Net receipts
$228,300.08
Less: Adjusted basis
12,569.43
Long-term capital gain
$215,730.65
50 percent taken into account
$107,865.33
The Richards Company in its corporation income tax return for 1960 reported the amount it had received out of the escrow, 5.5 percent of the net distributable proceeds resulting from Clark's payment into the escrow, namely, $13,115.92. This amount was applied, in the return, as an off-set to reduce the total amount of the corporation's moving expenses, which were deducted. Clark Oil & Refining Corporation filed its Federal income tax returns in Milwaukee, where they were audited, to which audit references are made hereinafter. On its books and in its income *156 tax return for 1960, Clark treated its gross payment in settlement of the suit in The Superior Court as a payment, in part, for the purchase of the Richards property in the amount of $25,000; and treated the balance as payment of "liquidating damages" for which it took a deduction. The actual bookkeeping entries on Clark's books, making the above-described allocations, were not made until February 17, 1960. However, Clark's accounting officer regarded Clark's payment of the award to petitioners in the arbitrators' decision, excepting the attorneys' fees of $35,000, to have accrued, properly, in October 1959. Subsequent to making the foregoing accounting entries, Clark obtained two real estate appraisals, the first dated August and December, 1960, and the second dated February 8, 1961. These showed a "fair market value" of the Richards property (land and buildings) of $36,700, and $25,000, respectively. Clark's income tax returns were examined by respondent's revenue agent in the Milwaukee office of the Internal Revenue Service, Edward Kloida, who was a group supervisor. During the course of his examination of Clark's return for 1960, there came to his attention Clark's manner of *157 treating and reporting for tax purposes the amount it had paid into the escrow under the decision of the arbitrators. Frank Provinzano, a revenue agent in Kloida's group in the respondent's Milwaukee office was sent to Chicago to examine the 1959 and 1960 Federal income tax returns of Richards and of the Richards Company and at some time after February 19, 1962, he went to Richards' offices to go over records of the petitioners. The purpose of Provinzano's inquiry, which was initiated in the respondent's Milwaukee office, was related to the treatment for tax purposes by the petitioners of the monies received from Clark. It was not customary for Provinzano, in the Milwaukee office, to make examinations of tax returns filed in Chicago, which were examined routinely by revenue agents in respondent's Chicago offices, and Provinzano, in the past, had only infrequently conducted examinations in Chicago in the course of his duties as an agent in the Milwaukee office. Prior to Provinzano's examination of petitioners' returns, two different revenue agents in the Chicago office of the Internal Revenue Service had examined petitioners' Federal income tax returns with reference to the allocation *158 of funds received from Clark, but neither agent proposed any adjustment in connection with that item. Prior to the issuance of the revenue agent's report upon which the respondent's determinations in issue here were based, Provinzano and others in respondent's offices in Milwaukee took the position that the income tax liability of Richards, in respect of the receipts from the payments by Clark, would be treated by the respondent in a manner consistent with the determination of Clark's tax liability. An attorney for Clark, Alfred Heon, was advised by a conference co-ordinator in the Milwaukee office of the respondent that as long as the Richards case was open, there could not be a settlement of Clark's tax liability. In order to obtain a tentative carryback adjustment by reason of a net operating loss carryback to 1959, Clark consented to an increase in income for that year in the amount it had deducted as payment of "damages" on its return; but Clark subsequently filed a claim for refund based on a claim for a deduction for a payment of "damages". That claim for a deduction and refund was still pending at the time of the trial of these cases. Respondent's Determinations Resulting *159 in Deficiencies 1. The general basis of the respondent's determinations in these cases is his theory about and interpretation of the nature of the payment of $287,500 (exclusive of $35,000 for attorneys' fees) which was made by Clark in 1960 under the arbitrators' decision and award. His theory is set forth hereinafter. In the case of Richards and his wife, only the year 1960 is involved. But in the case of the corporation Richards Company, which reports income under an accrual method, respondent has made alternative determinations, one relating to 1959, and the other relating to 1960. If the respondent's underlying theory is approved, the question will be reached, whether income in the amount of $262,500 accrued to the corporation in 1959, or whether income in the net amount of $207,728.45 was realized in 1960. The respondent's basic theory is that the payment by Clark of $287,500 (exclusive of $35,000 paid for attorneys' fees) under the arbitration award represented two things: (1) payment to Richards and his wife for the Richards property; and (2) payment to the corporation to settle and terminate a claim for damages that was tantamount to a payment of or in lieu of damages; *160 that the corporation was the real party claiming damages; that Clark's payment in settlement of an alleged claim for damages was made constructively to the corporation; and that the individual petitioners (who actually received the payment) received a distribution of dividends from the corporation which represents ordinary income. Under this theory the corporation failed to report in its return for either 1959 or 1960 ordinary income consisting of a payment for or in lieu of damages; the individual petitioners failed to report in their return for 1960 dividends received from the corporation, and they also incorrectly computed the amount of capital gain on the transfer of the improved real estate in too large amount. 2. Under his general theory, the respondent determined first that the value of the Richards property was $25,000, and he allocated that amount as the payment by Clark to the Richards, individually for the property. He then allocated $262,500, the balance of $287,500, as the payment of damages to the corporation, and he determined that this amount accrued to the corporation in 1959, when the arbitration award was made and first became payable. Or, in the alternative, *161 that the $262,500 accrued to the corporation in 1960, and that the net amount which is taxable is $207,728.45, as follows: Payment by Clark as damages
$262,500.00
Less: Amount received by corp.,
5.5% reported by reducing moving
expenses
13,115.92
$249,384.08
Less: Legal fees allocable to corp.
41,655.63
Net income rec'd. as damages
$207,728.45
In the above computation, the respondent took into account the distribution that was made directly to the corporation of $13,115.92, which is 5.5 percent of $238,471.34, the net amount after expenses which was paid out of the escrow in March 1960, as has been set forth above. The corporation reduced the amount of its deduction in its 1960 tax return for moving expenses by the above amount and thereby reported it in income. Richards paid fees to Topper and Oplatka (in addition to the $35,000 that Clark was required by the court to pay) in the amount of $45,625, as has been set forth above. Richards paid the sum of $45,625 out of the $287,500 deposited into the escrow by Clark under the arbitration decision. In his determination that the corporation and constructively realized in 1960 income from damages paid by *162 Clark in the amount of $262,500, respondent made the further determination that part of the legal fees paid to Topper and Oplatka was an expense that was allocable to the corporation on the basis of 91.3 percent ($262,500/$287,500); and he determined that the corporation's share of the expense was $41,655.63 (91.3 percent of $45,625). Accordingly, he subtracted that share of the legal fee expense from $262,500 in determining (in the alternative) that the corporation realized in 1960 net income from damages in the amount of $207,728.45. 3. In the case of the individual petitioners, Richards and his wife, the respondent made the following determinations for 1960, which correspond with his determinations of the corporation's taxable income for 1960: (a) He determined that the Richards received from the corporation a distribution of dividends in the amount of $207,728.45. He gave the following explanation: Net proceeds awarded to W. C. Richards Co. (Inc.) in conjunction with settlement of lawsuit for which proceeds were diverted to William C. and Grace Richards in 1960 are includible in gross income. Sec. 61, 1954 Internal Revenue Code. See adjustment (a), *163 Schedule 3 of W. C. Richards Co. (Inc.) report of even date covering 1960. (b) He determined that Richards and his wife had received $25,000 as the "Gross proceeds from sale of land and building located at 3108 Vermont, Blue Island, Illinois"; that the expenses incident to the sale totaled $4,356.62, as set forth below, leaving $20,643.38 as the amount of the net proceeds from the sale of the property; that the adjusted basis and unrecovered cost of the land and building was $12,569.43, (about which amount of the adjusted basis of the property there is no dispute between the parties); and that the amount of the long-term capital gain from the sale of the property in 1960 was $8,073.95, 50 percent thereof to be taken into account, or $4,036.97. The following summarizes these determinations: Gross proceeds from sale of property
$25,000.00
Less: Cost of stamps
$ 11.00
Title charges
376.25
Legal fees allocable *
3,969.37
4,356.62
Net proceeds from sale
$20,643.38
Less: Cost of property and allowed
depreciation
12,569.43
Corrected long-term capital gain
$ 8,073.95
50% of gain to be taken into account
$ 4,036.97
*164 (c) In their tax return for 1960, the Richards reported long-term capital gain from the sale of the property in the amount of $215,730.65, as follows: Gross sales price
$228,529.58
Less: Expense of sale
229.50
$228,300.08
Less: Adjusted basis
12,569.43
Long-term capital gain
$215,730.65 The petitioners took into account 50 percent of the capital gain, or $107,865.33. Since the respondent determined that the capital gain was only $8,073.95, and the amount to be taken into account was $4,036.97, he reduced the amount of the capital gain to be taken into account by $103,828.36, or from $107,865.33 to $4,036.97. In their 1960 tax return, Richards and his wife reported and paid income tax in the amount of $66,480.18. Part of that tax represented the tax on the capital gain reported on the sale of the Richards property in Blue Island, which amounted to $53,932.66. The Richards, individually, received from the escrow in 1960, the net amount of $225,355.42, after the costs and expenses involved. They applied $53,932.66 thereof in the payment of the capital gain tax which they reported on the sale of the property to Clark, which left a balance of $171,422.76. *165 General Facts Richards purchased land in Alsip, Illinois and constructed a paint factory building there in 1960. The Richards Company, while operating at the Vermont Street property in Blue Island, had rented 6,500 square feet of additional space near that property. After the Richards Company moved to the new property in Alsip, it was not feasible to continue to use the rented space in Blue Island and, therefore, it was necessary for Richards, individually, to construct another building on the new Alsip land to supplant the previously rented space. The supplemental building, containing 8,000 square feet, was constructed in 1961. The total cost of the land and 2 buildings in Alsip was $171,058.36, as shown below. Thus, Richards, individually, applied all of the net proceeds, after tax, that had been received out of the escrow from Clark ($171,422.76), except $364.40, in the acquisition and construction of the property and buildings that repalced the Blue Island property acquired by Clark. The Richards Company moved to and carried on its paint manufacturing business on the replacement property in Alsip. The Alsip property, owned individually by the Richards, is held in a land trust *166 of which The Harris National Bank is the trustee; and the Richards have leased the land and buildings to the Richards Company for a monthly rental of $2,700. Previously, the corporation leased 2 properties, the old Richards property and the supplemental 6,500 square feet of space nearby. The amounts expended by the Richards for the replacement property and buildings in Alsip are as follows: Cost of land in Alsip
$37,500.00
Factory building, 1960
94,726.30
Factory building, 1961
38,832.06
$171,058.36
The new factory building built in 1960 has about the same area, 15,000 square feet, as the old building on the Richards property acquired by Clark. Richards himself constructed the new buildings, thereby realizing considerable savings in costs compared to what the costs would have been if he had hired a contractor. Like the old buildings, the new buildings are constructed of cement blocks and brick walls, on concrete foundations, and the roofs are made of flexicord precast concrete, which is cheaper than the gypsum roof on the old building. Unlike the Richards property acquired by Clark, the replacement property does not have a spur railroad track connecting *167 with a railroad track, and to install a spur track (sidetrack) would cost at least $80,000. The Richards corporation did not sustain any loss by reason of relocating and moving to Alsip. Its profits for 1960 were 50 percent greater than they had been in 1959. There was no cessation of operations or loss of production caused by the move because the petitioners had been given 9 months to vacate and move from the old Richards property. The assets of Richards Company at the beginning of 1960 amounted to $319,538.99; income for 1960, before Federal income taxes, amounted to $133,275.17; and earned surplus at the end of 1960 amounted to $190,235.58. After Clark acquired the Richards property, it remained unused and undisturbed until July, 1963, when Clark tore down the buildings and removed the railroad sidetrack (spur track). In about May, 1964, Clark began the construction of a warehouse building on the Richards property which is used to store general supplies for the Clark refinery. Possession of the Richards property is also of value to Clark because it provides a safety factor, in that it was and is now possible to have an open space between the two large catalytic crackers, *168 one located to the northwest of the Richards property, and the other located directly to the east thereof. Clark's officer, Dawes, has admitted that the elimination of the fire hazard, caused by the presence of the paint factory between the two catalytic crackers, is of value to Clark. Over recent years, Clark acquired property fronting on and south of Vermont Street, i.e., across the street from the Richards property, for use as a parking lot. The frontage of the parking lot on Vermont Street extends for nearly the entire length of the southern leg of the triangular piece of property bounded by Vermont, Kedzie, and the railroad. The property was acquired lot by lot; there were dilapidated, old residences on the lots when Clark acquired them. Most of the parcels acquired by Clark for the parking lot have dimensions of 50 feet X 130 feet. The lowest and highest prices paid for parcels of this size were $2,000 and $16,500, respectively. If Clark had not purchased the Richards property and had been compelled to install hoods on the catalytic crackers to prevent the emission of the catalytic fines, the cost, as estimated by its refinery engineers, would have been roughly $150,000. *169 Very substantial extra costs were incurred in the installation of major electrical equipment in about 1957 because of Clark's inability to acquire the Richards property. The Clark electrical department stated in a report in 1961 that its February, 1957, engineering plan had to be altered as follows: Due to the difficulty of acquiring this property from the paint company, we had to do the following, before we could have a new location for the power station and electrical building. 1. We have to tear down the block locker building which measured 30feet X 25feet X 10feet, and build a new locker building in another area. 2. We had to relocate the Sheet Metal Warehouse to another area, which measured 32feet X 120feet X 10feet, because it was to low and not substantial for an electrical building to house 4,160 volt switchgear. The concrete floor was below grade and it had to be taken out and sand fill was brought in to elevate the new block concrete electrical building. 3. The main power station that fed the plant had to be relocated, due to the requirements needed to install the new power station. To eliminate a major plant shut down for a few weeks, it was decided to order additional *170 2400 volt switchgear and make all provisions possible to have everything in working order and cut over the old system one at a time into the new equipment. This setup kept the plant in production and no shutdown developed. The items of cost listed in that report totalled $186,880. Witness Dawes testified that the true additional costs were less than that amount, but might have been as high as $104,880. As has been stated above, an entry was made on Clark's books allocating $25,000 (of the total sum paid by Clark under the arbitration decision) as the "cost" of the Richards property. This bookkeeping entry was not made until February 17, 1960. Subsequent to making this entry on its books, Clark obtained 2 real estate appraisals of the Richards property, the first dated in August and December 1960, and the second dated February 8, 1961. These showed a "fair market value" of the Richards property (land and buildings) of $36,700 and $25,000, respectively. Issue 2. Profit Sharing Trust Contribution The Richards Company has a profit sharing plan, which includes a trust agreement, which was in effect on December 31, 1960. The fiscal year of the plan is the same as the fiscal year *171 of the corporation, namely from January 1 through December 31. Section 4.1 of the profit sharing plan, which relates to the contributions to be made by the corporation under the plan, provides inter alia that (1) the corporation's contribution shall be made out of the profits thereof during the fiscal year for which the contribution is made; and (2) that the amount of the contribution shall be determined by the board of directors at any regular or special meeting held during the fiscal year for which the contribution is made. In 1960, the directors of the corporation were William C. Richards, Leo Hopfgartner, Charles Holt, and Ethel Seemayer. At all times material, W. C. Richards owned no less than 9,898 shares of the 9,970 shares of issued and outstanding stock. The only issue here relative to the profit sharing plan is whether the meeting of the directors at which a contribution to the plan of $11,000 out of the profits for the fiscal year ending December 31, 1960, was held in December 1960 or in February 1961. The directors duly authorized the president to deposit in the plan $11,000 out of the corporation's profits for the year ending December 31, 1960. Letters dated December 27, 1960, signed *172 for the corporation by W. C. Richards, were sent to participants in the profit sharing plan, in which it was stated in part that the board of directors had "voted to deposit the sum of $11,000 in this trust. You will be advised later as to your share". Ultimate Findings of Fact 1. The parties to the agreement filed in the Superior Court, dated July 24, 1959, were Richards and his wife, individually, and the corporation, the Richards Company, the plaintiffs in Docket No. 58 S 11651; and Clark Oil & Refining Corporation and Irving H. Dawes, as an officer, and other corporation officers, the defendants. The parties to the agreement agreed in substance and effect as follows: (a) That Clark would purchase the Vermont Street property from the owners, the Richards, individually, for a purchase price equal to and in the amount fixed by a majority decision of the arbitrators as the replacement value of the Vermont Street property, namely, the cost of the land for a comparable, new factory site, plus the cost of erecting a new building at the new location including site improvements. (b) That Clark would pay the cost of moving, from the old location and setting up at the new location, *173 the machinery, equipment, and personal property used by the Richards Company in the paint business which it conducted, in such amount as fixed by the arbitrators; plus an amount fixed by the arbitrators as and for the loss of profit caused by the moving of the factory to the new location. Since the corporation, the Richards Company, conducted the paint business, rather than the individual parties to the agreement, the above costs and restoration of loss in profit constituted payments to be made by Clark to and for the benefit of the corporation. 2. The respective amounts fixed by the majority of the arbitrators as the payments to be made by Clark to the Richards, individually, for the Vermont Street property, under items 1 and 2 of the agreement, were $62,500, representing the cost of the land for the new factory site, and $160,000, representing the cost of the new factory building and site improvements, or the total sum of $222,500. 3. Clark purchased from the Richards, individually, the Vermont Street property for $222,500, which was the replacement value of the Vermont Street land and the reproduction-new value of the factory building and improvements located on the Vermont *174 Street land. Clark paid the sum of $222,500 to the Richards, individually, through the escrow, in return for which payment the Richards conveyed by deed the Vermont Street property to Clark. 4. The majority of the arbitrators fixed the amounts to be paid by Clark, under items 3 and 4 of the agreement, as follows: $33,000 as the cost of moving and setting up at the new location the machinery, equipment, and personal property used in the paint business of the corporation; and $32,000 as restoration of the loss of profit of the corporation caused by moving the factory to the new site; or a total sum of $65,000. 5. Clark paid $65,000 under the arbitrators' decision, into the escrow. The corporation, not the individual parties to the agreement, was entitled to receive out of the escrow the net amount remaining of the $65,000, after its payment of its share of the legal fees incurred in the lawsuit by all of the plaintiffs in the amount of $45,625. 6. Clark paid into the escrow the total amount of $287,500 under the arbitrators' decision pursuant to the agreement, which was the total sum of the amounts fixed by the arbitrators as the payments to cover items 1 through 4 in the agreement. *175 The proportionate shares, respectively, of the legal fees in the amount of $45,625, of Richards and his wife, individually, and of the Richards Company, were as follows: (a) the Richards, $222,500/$287,500, or 77.39 percent; and (b) the corporation, $65,000/$287,500, or 22.61 percent. The Richards' share of the legal fees incurred and paid was $35,309.78, and the corporation's share of the legal fees was $10,315.22. 7. The moving expenses of Richards Company in 1960, which were taken into account as a business expense on its tax return, were $17,662.63. Richards Company received a distribution out of the $287,500, paid into the escrow by Clark, in the amount of $13,115.92 (which was 5.5 percent of the net balance, after expenses, of $225,355.42). The distribution of $13,115.92 was income in 1960 to Richards Company, which included that income in its income for 1960, in its return, by application thereof to the moving expenses, thereby reducing the amount of its deduction therefor to $4,546.71. Richards Company was not reimbursed by the Richards, individually, for moving expenses of $4,546.71, which amount of cash was received and retained by the Richards, individually, as well as *176 an additional amount. 8. The Richards Company did not suffer any loss of profits during 1960 as a result of the relocation of its factory. In fact, its profits were 50 percent larger than they were in 1959. The corporation did not receive any amount for "loss of profit" out of the net balance of Clark's payment of $287,500, available for distribution after costs and expenses. 9. Out of Clark's payment of $287,500, the net amount which was distributed to the plaintiffs in the suit filed against Clark was $238,471.34; the various costs and expenses, charged to the plaintiffs at the closing in March 1960, and paid by them, were $49,028.66, as follows: Clark's payment for 4 purposes fixed
by arbitration
$287,500.00
Less charges paid by plaintiffs: Legal fees
$45,625.00
Real estate taxes
1,591.92
Prorated closing ex-
penses
1,424.49
Title charges
376.25
Revenue stamps
11.00
49,028.66
$238,471.34
10. Richards and his wife sold the Vermont Street property to Clark in 1960 for $222,500. The expenses of the sale, including their 77.39 percent of legal fees, were $35,697.03. The adjusted basis (unrecovered cost of the property) was $12,569.43. The *177 long-term capital gain resulting from the sale was $174,233.54, of which the 50 percent amount to be taken into account is $87,116.77, as follows: Clark's payment for property
$222,500.00
Less: Legal fees, 77.39%
$35,309.78
Title charges
376.25
Revenue stamps
11.00
35,697.03
Net proceeds of sale
$186,802.97
Less: Adjusted basis
12,569.43
Long-term capital gain
$174,233.54
50% to be taken into account
$ 87,116.77
11. Out of the payment by Clark of $287,500, the individual petitioners received the total net amount of $228,371.83, which comprised the following: (a) Net proceeds from sale of Rich-
ards property
$186,802.97
(b) Amount fixed for corporation's
loss of profit, less corporation's
share of legal fees
21,684.78
(c) Amount fixed for corporation's
moving expenses, less moving
expenses paid to corporation
19,884.08
Total received by the Richards, indi-
vidually
$228,371.83
The balance of the $287,500 was disbursed and used in the following way: (a) Richards' expenses of sale of
property
$ 35,697.03
(b) Corporation's share of legal fees
10,315.22
(c) Paid to corporation for moving
expense
13,115.92
$ 59,128.17
*178 The Clark payment of $287,500, accordingly, was applied and distributed, as follows: (a) Distribution to the Richards
$228,371.83
(b) Expenses and fees
46,012.25
(c) Distributed to corporation for
moving
13,115.92
$287,500.00
12. The Richards Company was one of the plaintiffs in the suit against Clark and a party to the agreement of July 24, 1959; and items 3 and 4 of the agreement (cost of moving and loss of profit caused by moving) related to Richards Company rather than to the individuals, the Richards. The arbitrators fixed the amounts of items 3 and 4 in the total sum of $65,000. That sum was payable to the Richards Company. The Richards corporation received directly $13,115.92 of the above amount. Since its proportionate share of legal fees, as found and determined here, was $10,315.22, an expense, the corporation constructively received this amount and is deemed to have contributed it toward the payment of legal fees. Accordingly, out of the $65,000, the corporation received $23,431.14, and it constructively received the balance, $41,568.86, which amount was received directly by Richards and his wife, as follows: Clark payments for corporation *179 per arbitrators' decision: Item 3, moving costs
$33,000.00
Item 4, profit loss
32,000.00
$65,000.00
Less: Payment to corp., moving
13,115.92
Expense, legal fees
10,315.22
23,431.14
Net sum awarded to corp.
$41,568.86
13. The Richards, individually, constructively received dividends from the Richards corporation in the amounts of $41,568.86. 14. Although the majority of the arbitrators filed their decision with Judge Sbarbaro on November 24, 1959, and although it was provided in agreement of July 24, 1959, that payment of the amount determined should be made by Clark within 30 days from the date of the decision, the Superior Court entered an order on December 23, 1959, extending the time for Clark's payment of the award to January 25, 1960. None of the income from the award accrued to the Richards corporation in 1959; such income accrued in 1960. 15. The arbitration agreement of July 24, 1959, was in fact an agreement in settlement of the lawsuit of the Richards and Richards Company against Clark and several of its officers. In substance, the settlement agreement comprised 3, and only 3, factors. That the suit would be dismissed and settled upon *180 the performance of the following steps: (1) Clark's purchase, and the Richards' conveyance to Clark, of the Richards' improved real estate in Blue Island, and Clark's payment of $222,500 for the property to the Richards. (2) Clark's payment of $65,000 for the benefit of the Richards corporation to reimburse it for its moving expenses and expected loss of profit in moving to the new location of the factory. (3) Clark's payment of reasonable attorneys' fees incurred by the plaintiffs, both the Richards and the corporation, in connection with the suit, in the amount of $35,000. All of the 3 steps agreed to in the settlement agreement were performed by Clark in 1960. No part of Clark's payment of $287,500 constituted a payment of damages, or in lieu of damages, to either the Richards, individually, or to the Richards corporation. No part of the settlement agreement of July 24, 1959, constituted an agreement whereby any part of the payments to be made by Clark would represent a payment of damages, or in lieu of damages, to the plaintiffs, or either one of them. The order of the Superior Court filed on September 8, 1960, dismissing the suit against Clark, did not by its terms, or in *181 substance, constitute all or any part of Clark's payments as a payment of damages or of anything other than the designations in the settlement agreement of July 24, 1959. The release and waiver of future claims against Clark, executed by the plaintiffs on March 10, 1960, was only, and no more than, a formal and general release, and was part of the stipulation of the parties agreeing to the dismissal of the suit, in view of the completion of the steps agreed to in the settlement agreement; and the release and waiver did not provide any basis for or require Clark to pay any amount as, or in lieu of, damages. 16. In the case of the individual petitioners, respondent made arbitrary determinations that were not based upon facts, in concluding that Clark paid only $25,000 for the Richards property; and that, also, as a result of Clark's total payment, the individual petitioners received dividends from the Richards corporation in 1960 in the amount of $207,728.45. In the case of Richards Company, the respondent was arbitrary in concluding that part of Clark's payment constituted the payment of damages to the corporation; that the corporation received damages in 1960 in the amount of *182 $207,728.45; or, in the alternative that $262,500 of damages accrued to the corporation in 1959. Issue 2. The meeting of the board of directors of the Richards Company at which the directors authorized the contribution of $11,000 to the profit sharing trust was held in December, 1960, prior to Christmas. The corporation is entitled to a deduction in 1960 of $11,000 for the contribution. Opinion The respondent's determinations, and the pleadings, present the following questions: Whether part of Clark's payment of $287,500 under the agreement in settlement of petitioners' suit against Clark (which did not go to trial) constituted a payment in the nature of, or in lieu of, damages; whether the lawsuit was primarily a claim for damages, or was primarily for the purpose of bringing about a sale of the Richards property to Clark; whether Clark in fact and substance paid only $25,000 for the Richards property, or paid $287,500 or some other amount for the property; whether any of Clark's payment accrued to the Richards corporation in 1959, rather than 1960; whether the individual petitioners constructively received dividends in 1960 in any amount from the Richards corporation, and *183 what amount of Clark's payments, if any, constituted a payment to the Richards corporation under the terms of the settlement agreement. There is a second issue, whether the required authorization of the directors of the corporation for the corporation's 1960 contribution to its profit sharing fund was given at a directors' meeting held in December 1960, rather than at some time in 1961. The question is in which year the directors' meeting was held. All of the questions under both issues are questions of fact. The lengthy ultimate findings dispose of all of the questions, and very little discussion of the questions is necessary. Petitioners contend, and we agree, that the respondent's determinations in each of these cases were arbitrary and were not based upon facts, or a reasonable construction of the terms of the settlement agreement of July 24, 1960, or of the arbitrators' decision, or of the payments made by Clark in compliance with the arbitrators' award, of the general waiver and release given by the petitioners as a formal and pro forma part of the court's final order dismissing the suit. Respondent adopted a wholly arbitrary theory, about the settlement of the lawsuit *184 against Clark, unsupported by the entire evidence adduced here, in making his determinations relating to the taxable year 1960 in each of these cases; and his alternative determination relating to the corporation's taxable year, 1959, is not supported by the evidence and general facts. It follows that (as petitioners contend), none of the respondent's determinations under the first issue have the standing of being presumptively correct. See Helvering v. Taylor, 293 U.S. 507; Clark v. Commissioner, 266 F. 2d 698; Welch v. Commissioner, 297 F. 2d 309; Gasper v. Commissioner, 255 F. 2d 284; and Acorn Refining Co., 2 B.T.A. 253. The petitioners, on the other hand, introduced evidence through which their burden of proof has been discharged, for the most part, even if the ordinary presumption of correctness could be attributed to every determination of the respondent under the first issue. The facts have been fully stated in the findings and ultimate findings and very few comments on the facts and evidence are necessary. Our conclusions about the facts and general circumstances are these: The Richards, individually, *185 acquired and improved the Vermont Street property, and the Richards corporation operated a paint manufacturing business on that property, several years before Clark completed its gradual accumulations and acquisitions of parcels of land in the large, triangular area of land, to the east, north, and west of the relatively small piece of land owned by the Richards. Clark constructed the various and several facilities and structures which constituted its oil refinery. The close proximity of Clark's cracking plant to the Richards property constituted a continuous hazard which might become the cause of fires on the Richards property. There were frequent fires on the Clark properties. Being "surrounded" by Clark's oil refinery, the Richards and the Richards Company had no alternative other than to move; and in order to move, the Richards were obliged to sell their improved property and to purchase a substitute site and construct a new factory. The general situation of the Richards and their corporation was that due to circumstances which were not of their own creation, they were in the position of being forced to sell the Vermont Street property; and Clark was the only likely purchaser thereof. *186 Moreover, the Richards faced the expense of replacing the old factory with new buildings, and were obliged to ask a price for the Vermont Street property which would represent the replacement value of the land and the reproduction-cost-new of the factory on the Vermont Street land and of other space then consisting of rented space. During several years, the Richards carried on negotiations with Clark in an effort to sell the property to Clark, during which the Richards asked $275,000 for the property, the replacement and reproduction-cost-new value, exclusive of an additional amount for the expected income tax which would result from capital gain. Beginning in 1953, 5 years before the petitioners filed the lawsuit against Clark on July 29, 1958, Clark repeatedly attempted to purchase the Richards property and offered, in September 1956, to pay as much as $100,000, and later in 1956, $135,000 (a great deal more than the $25,000 the respondent has determined as the amount that Clark paid for the property). For example, in 1956, Richards engaged the services of the law firm of Righeimer and Righeimer in Chicago to discuss with Irving H. Dawes, executive vice president of Clark Oil & *187 Refining Corporation, the matter of selling the Richards property to Clark, and Richards, himself, had discussions with Dawes. At first, Dawes offered $100,000. Dawes took into account the expenses that Richards would be obliged to incur in acquiring a substitute property, and he made a firm, written offer to Richards, in a letter dated September 7, 1956, as follows: Accordingly, we will pay you the sum of $100,000.00 for good title to the land. You would have the right to remove all improvements, including buildings, and any underground improvements that you might have. Possession would be given to us on or before March 1, 1957. When it became impossible to arrive at any agreement with Clark on a price close to the replacement and reproduction-costnew of the property, Richards resorted to filing an action in equity against Clark, whereby Richards hoped to bring Clark to an agreement to purchase the Richards property at a price that would enable the Richards to acquire a site and build a replacement factory building. The sale of the property was the real purpose of the filing of the lawsuit in equity against Clark. We need not elaborate upon the obvious aspects of that sort of *188 action in equity, through which there was the possibility that the Richards might obtain an injunction against Clark which would, in turn, lead to negotiations with Clark for the sale of the Vermont Street property to Clark at a price which would enable the Richards to acquire a substitute site and factory building. It is clear, in the evidence, that in fact there had not yet been any real and substantial physical damage to the Richards factory. The conclusion is free from doubt that the primary purpose of the lawsuit was not to obtain a payment of damages by Clark; and that the primary purpose was to put pressure on Clark to purchase the Richards property for an adequate price, under all of the circumstances. In fact, that result was accomplished by filing the lawsuit. The clear implications of the lawsuit were understood by the officers of Clark, and the case did not go to trial. Clark's officers understood the predicament of the Richards and their corporation, and they also understood that the primary purpose of Richards and the corporation in filing the suit was to bring about a sale of the property to Clark. After the filing of the lawsuit, Dawes, an officer of Clark, stated *189 to Judge Sbarbaro in a pretrial conference in chambers, as is set forth in the arbitration agreement of July 24, 1959, that Clark would be "willing to cooperate in the relocation of plaintiffs' factory; and to that end, defendants were willing to pay a lump sum to the plaintiffs comprised of" the first 4 items in the arbitration agreement. We come now to the arbitration settlement agreement. The terms thereof are clear, definite, and free from ambiguity. The questions presented under the main issue must be decided, and are decided, on the basis of the terms of that agreement. It has been found, and it is held, that the arbitration and settlement agreement provided basically and primarily for the sale and purchase of the Richards property at a replacement value to be decided by a majority of a board of arbitrators. In addition, the agreement provided that Clark would pay an amount for the cost of moving the equipment used in the paint manufacturing business to the new factory, and an amount to cover the loss of profit incident to and caused by moving to the new factory building. It has been found, and it is held, that nothing in the arbitration and settlement agreement, in itself, *190 or in the formal steps taken in the dismissal of the suit, called for Clark's payment of any amount as damages, or in lieu of damages, to either the Richards, individually, or to the Richards corporation. Respondent's theory and determinations to that effect are wholly unfounded in fact, and are not supported by the evidence. The determinations of the respondent in both of these cases relating to the taxable year 1960, and in the corporation's case, relating to the year 1959 in the alternative, which are based upon his view that part of Clark's payments, under the arbitration and settlement agreement and the arbitrators' award, constituted a payment in lieu of damages are clearly erroneous and are set aside; and it is so held. On the whole, in substance, the petitioners' contentions are correct and must be sustained, with certain exceptions: The settlement agreement and the arbitrators' decision and award specifically dealt with 4 items, exclusive of Clark's share of attorneys' fees. The first 2 items dealt with the replacement cost of the Richards land and factory building, which was to be fixed by the arbitrators on the basis of what it would cost to acquire comparable land *191 and to construct a new factory. The arbitrators awarded to the Richards, individually, as the owners of the property, $222,500, as the sum to be paid to them by Clark for their property. On the other hand, since the Richards corporation operated the paint factory and owned equipment and machinery used in the factory, and since it was the corporation's profits from its business which (it was believed) would be curtailed as a result of the interruption in business caused by moving the factory, items 3 and 4 in the arbitration and settlement agreement and in the award were clearly provisions for the benefit of the Richards corporation. Therefore, the only errors we are able to find in the contentions of the petitioners lie in their treatment of Clark's payment of $62,000, the total sum fixed by the arbitrators as the payments to be made by Clark under items 3 and 4. It has been found, and it is held, as follows: (1) That the Richards, individually, received from Clark the gross sum of $222,500 for their Vermont Street property in a purchase and sale transaction. (2) That the Richards corporation was entitled to receive $65,000 under the settlement agreement and arbitrators' award, *192 of which sum it received directly $13,115.92; contributed to lawyers' fees a proportionate contribution, which we find and determine amounted to $10,315.22; and constructively received the balance in the amount of $41,568.86. (3) That the Richards, individually, constructively received from the Richards corporation dividends in the amount of $41,568.86. They received that net sum out of the escrow but did not pay it over to the corporation, which was entitled to receive and apply it to its moving expenses, and to loss of profits, if any. The Richards, individually, were not awarded any of the $65,000 under items 3 and 4 of the agreement and award, and they realized income from that source in the net amount of $41,568.87, which constituted a constructive distribution of dividends by the corporation. (4) That for the purposes of the tax issues here, effect cannot be given to the allocation of 94.5 percent of the net proceeds of Clark's payment of $287,500 to the Richards, individually. Petitioners' attorney, Topper, worked out this allocation, which was based upon certain facts, but those facts are irrelevant and immaterial in relation to items 3 and 4 of the settlement agreement *193 and decision of the arbitrators. Correspondingly, effect cannot be given to the allocation to the corporation of 5.5 percent of the net proceeds of Clark's payment. The 94.5 percent and 5.5 percent ratios which were used in allocating $13,115.92 to the Richards corporation, while arithmetically right, are not relevant and are not applicable in the determination of the questions in issue here. The remaining question is whether any income accrued in 1959 to the corporation under the arbitrators' decision and award rather than in 1960. This question arises under the alternative determination of the respondent. It has been found, and it is held, that no income accrued in 1959 to the corporation under the arbitration award. Although the contentions of the petitioners are correct, for the most part the evidence does not support their particular contention that under the settlement agreement and the award of the board of arbitrators the price determined and fixed as the consideration to be paid to the Richards, individually, for the improved real estate on Vermont Street was more than $222,500. The evidence does not support and we cannot conclude that the price determined, as stated above, *194 was the entire sum of $287,500. Petitioners' contention that the arbitrators' award for the purchase price of the real estate and the improvements was $287,500, rather than $222,500, does not represent a reasonable or factually supportable construction of the provisions of the settlement agreement and award. In this aspect, Morse v. United States, 183 F. Supp. 847, and Farmers' & Merchants' Bank of Catlettsburg v. Commissioner, 59 F. 2d 912, are distinguishable on their particular facts. Furthermore, the petitioners have failed to give consideration to the fact that the moving expenses of the Richards Company, as reported in its tax return for 1960, amounted to $17,662.63, and that under the proportionate allocation to the corporation which Topper worked out, the corporation received a cash distribution of, only $13,115.92, less than its moving expenses, for which the board of arbitrators fixed the compensation at $33,000. In addition, the corporation's share of the legal fees incurred by the plaintiffs (petitioners here) in the lawsuit against Clark has not been taken into account realistically by the petitioners. We have made a determination of the corporation's *195 share of such legal expenses which, in our opinion, is realistic and practical under the facts and circumstances. In the matter of the arbitrators' award of $32,000 for potential and possible loss of profit, incident to moving the paint manufacturing factory, there is no reasonable basis in the settlement agreement, in the arbitrators' award and in the record here for attributing that amount to the Richards, individually, as part of the purchase price of their Vermont Street property. The point that the petitioners' contention overlooks is that there were 2 plaintiffs in the suit against Clark, the two Richards, individually, and the Richards Company, the corporation; that the Vermont Street property was owned by the Richards, individually, but they did not operate the paint manufacturing business, and they did not own all or most of the equipment and machinery used in that business, which was operated by the corporation; the corporation owned the equipment. This dichotomy, of property ownership and business operation, existed when the settlement agreement was written and executed, and it clearly was recognized and provided for by the enumeration in the agreement and arbitrators' *196 award of 4 separate items, the first two items being concerned with the price to be paid to the Richards, individually, for their Vermont Street land and improvements, the last two items being concerned with the moving and operation by the corporation of the paint manufacturing business, and the corporation's profit from the business. There is no real dispute here regarding the following, namely, that if it is held that a sale of the Vermont Street property was made by the Richards to Clark under the provisions of the settlement agreement and arbitrators' decision, then, the transaction qualifies as a sale or exchange, and the resulting gain properly is to be treated as capital gain. Petitioners' contention to this effect is correct and is sustained. They realized, as determined here, capital gain in 1960 in the amount of $174,233.54, of which 50 percent is to be taken into account, or $87,116.77. See the following: Helvering v. Hammel, 311 U.S. 504; Electro-Chemical Engraving Co. v. Commissioner, 311 U.S. 513; Hawaiian Gas Products, Ltd. v. Commissioner, 126 F. 2d 4, certiorari denied 317 U.S. 653. Petitioners argue, as an *197 alternative contention, that if it is held that any amount represented a distribution to them by the corporation, such distribution was not essentially equivalent to a dividend under section 331(a)(2) of the Code. Consideration has been given to this contention, but we are unable to find any sound basis in support thereof. The question is largely one of fact. The petitioners have failed to establish that, in fact, the net cash amount, which they received out of the escrow, of the portion of the award that clearly was made to and for the benefit of the corporation, $41,568.86, was not a constructive distribution of a dividend by the corporation. The remaining question involves the alternative determination of the respondent in the case of the Richards Company that income accrued to it in 1959 (rather than in 1960) under the arbitrators' award. It is concluded that at the end of 1959, no income under the award accrued to the corporation. See section 1.451-1(a), Income Tax Regulations. Continental Tie & Lumber Co. v. United States, 286 U.S. 290; George K. Herman Chevrolet, Inc., 39 T.C. 846; and Lamm Lumber Co., 45 B.T.A. 1, *198 affirmed 133 F. 2d 433, on their respective facts, are distinguishable. The arbitration agreement was entered into as part of the Superior Court proceeding and was subject to court supervision. No sum was payable under the agreement until Judge Sbarbaro had determined one of the items specified in the agreement, attorneys' fees to be paid by Clark. Thus, no amount was properly accruable until 1960, when Judge Sbarbaro made the finding that Clark was to pay $35,000 as legal fees, and a final court order was entered, and the amounts were paid. That order was not entered until March 17, 1960. Issue 2. The Richards Company is entitled to a deduction of $11,000 in 1960, the amount which it paid into its profit sharing trust out of its 1960 earnings and profits, provided the directors duly authorized that contribution before the end of and during 1960 (the fiscal year of the taxpayer being the calendar year). It is a question of fact whether the meeting of the directors, when the contribution was authorized by them, was held in December 1960, or in February 1961. The evidence establishes that the meeting in question was held in December 1960, and this finding is made. *199 The uncontradicted testimony and letters sent to participants in the plan in December, 1960, establish that fact. We are satisfied that the bookkeeper who typed the minutes of the meeting of the directors that was held shortly before Christmas in 1960 purposely misdated the minutes under the mistaken (but well-meaning) belief that he should do so, for reasons relating to bookkeeping matters. The bookkeeper's testimony, under all of the circumstances, is credible. Moreover, it is not required that a corporate record must be binding upon the taxpayer if there is proof that such record is contrary to the facts. Dome Co., 26 B.T.A. 1967. Since the date in 1961 typed on the minutes of the meeting of the directors was not correct, and since the meeting in question was held shortly before December 25, 1960, there was the necessary compliance with the provisions of section 4.1 of the profit sharing plan. The Richards Company is entitled to the deduction of $11,000 in 1960. Under Rule 50, adjustments will be made with respect to the taxable year 1960 in both cases reflecting the conclusions under Issue 1; and the alternative determinations in the case of the corporation with *200 respect to the year 1959 will be adjusted. In addition, effect will be given to several other adjustments which have been disposed of by the parties under their stipulation. Decisions will be entered under Rule 50. Footnotes
*. Total legal fees paid (apart from $35,000) $45,625; $25,000/$287,500 or 8.7% of $45,625 equals $3,969.37 for legal fees allocable to the sale of the property.↩